**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

THE DERON SCHOOL OF NEW JERSEY,
INC.; et al.,

               Plaintiffs,

    v.

                  Civ. Action No. 09-3477 (KSH) (PS)

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.

                  **OPINION**

               Defendants.

## I.     Introduction

The core facts of this case date back to 1984, when an official at a regional office of the United States Department of Agriculture ("USDA") authorized a plan that permitted plaintiffs The Deron School of New Jersey, ELO Incorporated, and KDDS Inc. (collectively "the Plaintiff-Schools") to participate in federally funded lunch and breakfast programs that are statutorily available only to public schools and non-profit schools. Under that "workaround," the Plaintiff-Schools, which serve students with disabilities, received federally subsidized meals for financially eligible students even though the schools are for-profit entities. Then, in 2007, the New Jersey Department of Agriculture, which serves as a conduit for the federal subsidies, notified the Plaintiff-Schools that they would no longer receive the federal subsidies.

In their federal lawsuit, the Plaintiff-Schools are challenging the cancellation of the federal subsidies on a variety of grounds. Three motions are now before the Court. The first is a motion for summary judgment brought by defendants the New Jersey Department of Agriculture, the New Jersey Secretary of Agriculture, the New Jersey Department of Education, and the New Jersey Commissioner of Education (collectively "the State Defendants"). The second is a motion

1

to dismiss for lack of jurisdiction, or in the alternative, a motion for summary judgment, brought by the USDA and the United States Secretary of Agriculture (collectively "the Federal Defendants").  The third is a motion by the Federal Defendants to strike the reports of plaintiffs' two expert witnesses.

After carefully reviewing the record and holding oral argument, the Court concludes that the Plaintiff-Schools have carried their burden of establishing Article III standing to sue on behalf of themselves and their students, and that summary judgment should be denied as to the Rehabilitation Act, Americans with Disabilities Act, and Administrative Procedure Act claims. Summary judgment is granted as to the remainder of the claims.

## II.     Factual Background and Procedural History

Many of the critical facts are undisputed and are drawn from the parties' statements of undisputed facts and supporting documentation.

### A.  The Parties

The plaintiffs are for-profit private schools serving students with disabilities.  Plaintiff The Deron School of New Jersey, Inc. founded in the 1960s, operates two schools, Deron I and Deron II, located in Union and Montclair respectively.  (State Defs.' Stmt. Material Facts ¶ 1; Pls.' Resp. Stmt. Material Facts ¶ 1.)  Plaintiff ELO Incorporated operates The Gramon School in Fairfield and plaintiff KDDS Inc. operates Glenview Academy, also in Fairfield.  (State Defs.' Stmt. Material Facts ¶ 2; Pls.' Resp. Stmt. Material Facts ¶ 2.)  Under mechanisms authorized by New Jersey law, each school is permitted to enroll "special needs students from public schools" and charge tuition to the public school districts.  (State Defs.' Stmt. Material Facts ¶ 3 (citing N.J.S.A. 18A:46-15; N.J.S.A. 18A:46-21); Pls.' Resp. Stmt. Material Facts ¶ 3.)  The Plaintiff-Schools largely enroll the children of disadvantaged families; in the school year 2009–2010, 80%

of the students attending Deron I, 85% of the students attending Deron II, 92% of students attending The Gramon School, and 100% of students attending Glenview Academy met the household income requirements for free or reduced-price meals under the pertinent federal programs.  (Alter Cert. ¶ 7, appended to Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J., Exh. 1; Weeks Cert. ¶ 7, appended to Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J., Ex. 2.) The Plaintiff-Schools are suing on behalf of themselves and, on some counts, their students.

To varying degrees discussed in more detail below, both sets of defendants are responsible for administration of the National School Lunch Program and the School Breakfast Program.  (Federal Defs.' Stmt. Material Facts ¶ 1; Pls.' Resp. Stmt. Material Facts ¶ 1.)

### B.  The National School Lunch Act and the Child Nutrition Act

In 1946, Congress enacted the National School Lunch Act ("NSLA"), 42 U.S.C. § 1751 *et seq*.  The NSLA sets forth a policy of safeguarding "the health and well-being of the Nation's children" in part "through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school lunch programs."  42 U.S.C. § 1751.  To that end, the NSLA establishes a federal program directing money to the states to pay for all or part of eligible students' lunches. *See* 42 U.S.C. § 1757–58.  The states may distribute the money only to "schools" as defined under the statute.  *See, e.g.*, 42 U.S.C. § 1756.  Under the NSLA,

> '[s]chool' means (A) *any public or nonprofit private school* of high school grade or under, and (B) any public or licensed nonprofit private residential child care institution (including, but not limited to, orphanages and homes for the mentally retarded, but excluding Job Corps Centers funded by the Department of Labor). For purposes of this paragraph, the term "nonprofit," when applied to any such private school or institution, means any such school or institution which is exempt from tax under section 501(c)(3) of Title 26.

42 U.S.C. § 1760(d)(5) (emphasis added).

Because the Plaintiff-Schools are for-profit private schools, they do not fit within the NSLA's

definition of "schools."  (Federal Defs.' Stmt. Material Facts ¶ 2; Pls.' Resp. Stmt. Material Facts

¶ 2.)

In 1966, Congress enacted the Child Nutrition Act ("CNA"), 42 U.S.C. § 1771 *et seq*.

The CNA provides for the creation of a federally subsidized school breakfast program that

operates similarly to the NSLA's lunch program. *See* 42 U.S.C. § 1773.  The CNA's definition

of a "school" is identical to the NSLA's definition, *see* 42 U.S.C. § 1784(3), and the CNA thus

also precludes the Plaintiff-Schools from participation.

### C.  Plaintiffs' Participation Through the "Workaround"

On September 17, 1984, officials from the Deron School met with employees of the

USDA Food and Nutrition Service ("FNS") Mid-Atlantic Regional Office regarding the meals

programs.  (Federal Defs.' Stmt. Material Facts ¶ 4; Pls.' Resp. Stmt. Material Facts ¶ 4.)  The

USDA representatives at the meeting were not attorneys.  (Federal Defs.' Stmt. Material Facts

¶ 5; Pls.' Resp. Stmt. Material Facts ¶ 5.)  Three days later, Sallie Ellner, a food program

specialist at the USDA, entered a "Memo for the File" regarding the meeting.  (*See* Federal

Defs.' App., Ex. 1.)  Ellner first observed that under New Jersey law, "all State monies received

by the Derone [sic] School must be used for educational purposes and not for the food service."

(*Id.*)  She further noted, however, that the Deron School had reached an agreement with the

Montclair School District under which it continued collecting federal subsidies for school

lunches:

> Derone School and the Montclair S.D. have reached an agreement
> wherein, in order to receive reimbursement under the NSLP for
> children attending the Derone School, the Montclair District will
> completely take over the entire food service from the Derone

School; this will include the purchasing of food and the placement of District personnel in the Derone School kitchen and cafeteria. Free and reduced price applications will be disseminated and evaluated by the Derone School, but the Montclair District will check the determinations.  Montclair S.D. will claim all children who participate, including those from other districts.

(*Id.*)

The USDA officials at the meeting agreed "that this arrangement will be satisfactory and would fulfill the requirements of Section 504 [of the Rehabilitation Act], which addresses the handicapped."  (*Id.*)  The Plaintiff-Schools refer to this arrangement as "the workaround." (Federal Defs.' Stmt. Material Facts ¶ 6; Pls.' Resp. Stmt. Material Facts ¶ 6.)   The Montclair Board of Education reached similar arrangements with the other Plaintiff-Schools in the early-to mid-1990s.  (Pls.' Supp. Stmt. Disputed Material Facts ¶ 32; Federal Defs.' Resp. Stmt. Material Facts ¶ 32; Federal Defs.' Stmt. Material Facts ¶ 8; Pls.' Resp. Stmt. Material Facts ¶ 8.)  The Plaintiff-Schools continued to use this system until 2007.

### D.  The USDA 2002 Memorandum

On November 1, 2002, Stanley C. Garnett, the Director of the Child Nutrition Division of the FNS, distributed a memorandum to all regional directors, prompted by "[q]uestions . . . regarding the eligibility for reimbursement of meals served to children who are placed by a public school district in special schools or institutions . . . which are either not eligible to participate or choose not to participate" in meals programs.  (*See* Federal Defs.' App., Ex. 5.) The memorandum explained that "[w]hen a public school district is unable to provide needed services directly to children, it may contract with a school to provide the needed educational services."  (*Id.*)  As an example, Garnett observed that schools "may place children who are discipline problems in an alternative school or place disabled children in a specialized school." (*Id.*)  The memorandum noted that for-profit schools are ineligible to participate in the program

and concluded that "[t]he key to whether meals served to these children may be claimed for reimbursement depends on whether the school at which the meal is served participates in" the meals program.  (*Id.*)

Though the reasoning and conclusion of this memorandum are directly applicable to the arrangement between the Plaintiff-Schools and the Montclair School Board, apparently no immediate repercussions occurred with regard to the federal subsidies paid to Montclair through the NJDOA.

### E.  The Termination of the Workaround

On August 10, 2007, Emma Davis-Kovacs, Director of the Division of Food and Nutrition for the NJDOA, sent a letter to Dana Sullivan, the Montclair School Board Secretary/School Business Administrator, stating that a review of the Montclair Board of Education's budget revealed that students enrolled in the Plaintiff-Schools were participating impermissibly in the National School Lunch Program and the School Breakfast Program.  (*See* Federal Defs.' App., Ex. 6.)  The letter explained that the USDA agreed to allow these schools to continue participating through the end of the calendar year "to provide the affected schools adequate time to transition to alternative meal service arrangements."  (*Id.*)

As part of their placement arrangements, local sending districts pay tuition for each student enrolled in the Plaintiff-Schools.  (*See* Federal Defs.' Stmt. Material Facts ¶ 15; Pls.' Resp. Stmt. Material Facts ¶ 15.)  That tuition covers "inter alia, administrative, instructional, and food service expenses, plus a two and one half percent (2.5%) surcharge on all allowable tuition expenses, which enables the schools to operate at a profit."  (Federal Defs.' Stmt. Material Facts ¶ 18; Pls.' Resp. Stmt. Material Facts ¶ 18.)  Since NJDOA stopped permitting reimbursement through the workaround on January 1, 2008, the Plaintiff-Schools have included

the cost of student meals in tuition charged to school districts.  (Federal Defs.' Stmt. Material Facts ¶ 25–26; Pls.' Resp. Stmt. Material Facts ¶ 25–26.)  This increase in the cost of tuition includes the standard 2.5% surcharge.  (Federal Defs.' Stmt. Material Facts ¶ 27; Pls.' Resp. Stmt. Material Facts ¶ 27.)

The parties dispute the fallout of the tuition hike, and both sides have obtained expert witnesses to support their positions.  The Plaintiff-Schools' experts are Vito Gagliardi, a former New Jersey Commissioner of Education, and Robert H. Davis, a consultant employed by the Hoboken Public Schools as an Interim School Business Administrator.  (Liss Cert., Ex. 2–3.)  In substance, they report that by increasing tuition, plaintiffs have made themselves less competitive, thus adversely affecting enrollment numbers and further decreasing revenue.  (*See generally id.*)  The Federal Defendants' expert witness, Dr. William G. Hamm, is an economics consultant at Berkeley Research Group, LLC.  (Federal Defs.' App., Ex. 7.)  His report argues that the Plaintiff-Schools' experts' reports are "completely devoid of any quantitative or evidence-based analysis of the relationship between the Federal Defendants' actions and the economic position of the Plaintiff-Schools," and that no causal link exists between the Plaintiff-Schools' decision to add the costs of meals into tuition and their changes in enrollment.  (*Id.* at 2.)

### F.  Procedural History

On December 21, 2007, the Plaintiff-Schools filed a verified complaint in New Jersey Superior Court.  (*See* State Defs.' App., Collier Cert., Ex. G.)  The complaint set forth claims against the New Jersey Commissioner of Education, the NJDOE, and the NJDOA.  (*Id.* at 1.) The Plaintiff-Schools alleged four counts: (1) violation of the students' right to a thorough and efficient education under the New Jersey Constitution; (2) violation of the students' right to

equal protection under Article I of the New Jersey Constitution; (3) violation of N.J.A.C. 6A:14-1.1 et seq., which requires, among other things, that students with disabilities have access to a "free, appropriate public education" under the Individuals with Disabilities Education Act[1]; and (4) violation of the plaintiffs' right to equal protection under Article I of the New Jersey Constitution.  (*Id.* at 10–13.)  The Plaintiff-Schools demanded injunctive relief so that they could continue using the workaround system.  (*Id.* at 14.)

The Plaintiff-Schools filed for a preliminary injunction, and defendants moved to dismiss.  *Deron Sch. of N.J., Inc. v. Davy*, No. MER-L-451-08 (N.J. Super. Ct. Mar. 31, 2008) (Feinberg, P.J.S.C.) (slip op. at 2) (appended to Collier Cert. at Ex. J).  Addressing the dueling demands, Judge Linda Feinberg first held that the Plaintiff-Schools had standing to bring this action on their own behalf and on behalf of their students.  *Id.* (slip op. at 13–14).  She then dismissed the claim of a violation of N.J.A.C. 6A:14-1.1 because that regulation is promulgated pursuant to IDEA, which confers a private right of action only upon children with disabilities and their parents, not the schools.  *Id.* (slip op. at 14–16).

In the final and most substantial part of her opinion, Judge Feinberg dismissed the remainder of the action for failure to exhaust administrative remedies.  Specifically, N.J.A.C. 6A:14-1.1 *et seq.* provides students with the framework for their right to a "free and appropriate public education," and those regulations allow a "due process hearing" where parents "can raise any matter relating to the identification, evaluation or educational placement of the child, or the provision of a free, appropriate public education to the child."  *Id.* (slip op. at 17–18).  Parents may then challenge the administrative law judge's decision in court or through the

---

[1] Unlike the federal case, the state case heavily emphasized a state law requirement that classroom instructional costs account for 55% of overall costs.  The plaintiffs complained that the need to add the cost of meals to their tuition dropped the percentage of their budget spent on instructional purposes.

Commissioner of Education.  *Id.* (slip op. at 18).  Judge Feinberg held that exhaustion would ensure that a body with expertise heard the matter and that a full factual record could be developed; therefore, she reasoned, the use of the administrative remedy was more appropriate than continuing in court.  *Id.* (slip op. at 20–21).  Because the children on whose behalf the Plaintiff-Schools were suing had not exhausted these administrative channels for relief, Judge Feinberg dismissed the complaint.  *Id.* (slip op. at 27).

The Plaintiff-Schools then filed a Petition of Appeal with the Commissioner of the NJDOE, largely duplicating the counts asserted in the state court claim.  (*See* State Defs.' App., Collier Cert., Ex. K.)  The matter was forwarded to the Office of Administrative Law.  (State Defs.' Stmt. Material Facts ¶ 40; Pls.' Resp. Stmt. Material Facts ¶ 40.)  On May 27, 2009, the Plaintiff-Schools withdrew their appeal, citing new information that had come to light after public records requests demonstrated that the NJDOA and the USDA also played roles in the decision.  (State Defs.' App., Collier Cert., Ex. L.)

The Plaintiff-Schools filed the present action on July 15, 2009.  [D.E. 1.]  Since filing their complaint, they have abandoned several of the counts originally pleaded. [2]  The complaint now sets forth the following counts: (1) against the State Defendants, equitable estoppel; (2) against the State Defendants and the Federal Defendants, violation of students' rights under Rehabilitation Act section 504; (3) against the State Defendants, violation of students' rights under the Individuals with Disabilities Education Act; (4) against the State Defendants and the

---

[2] On August 25, 2011, the Plaintiff-Schools sent a letter informing the Court that they were abandoning the following claims that had originally asserted: (1) equitable estoppel as to Federal Defendants only; (2) IDEA as to Federal Defendants only; (3) Administrative Procedure Act as to State Defendants only; (4) takings as to State Defendants only; (5) Americans with Disabilities Act as to Federal Defendants only; (6) writ of mandamus as to State Defendants only; and (7) right to a thorough and efficient education under the New Jersey Constitution as to all defendants.  [D.E. 177.]

Federal Defendants, violation of students' rights to equal protection under the Fifth and Fourteenth Amendments; (5) against the Federal Defendants, violation of the Administrative Procedure Act because the action was arbitrary and capricious and because it lacked time for notice and comment; (6) against the Federal Defendants, unconstitutional taking of plaintiffs' property; (7) against the State Defendants, violation of the students' rights under the Americans with Disabilities Act; (8) against the Federal Defendants, inadequacy of remedy at law and demand for a writ of mandamus; (9) against the State Defendants and the Federal Defendants, violation of students' right to equal protection under Article I of the New Jersey Constitution; and (10) against the State and Federal Defendants, violation of the Plaintiff-Schools' right to equal protection under Article I of the New Jersey Constitution.

The Federal Defendants and the State Defendants filed motions to dismiss, which the Court denied.  [D.E. 21, 22, 41.]  The Court held that under the applicable standard of review at that stage of the litigation, plaintiffs established standing to sue on their own behalf and on behalf of the students, and it reserved judgment on the remaining issues so as to avoid pruning the complaint prematurely.  (*See* Tr. of Mot. Dismiss Op. at 46–60.)

At the close of discovery, the Federal Defendants filed a motion to strike the expert designations and reports of Robert H. Davis and Vito Gagliardi [D.E. 140], and a motion to dismiss pursuant to Rule 12(h)(3), or in the alternative, for summary judgment [D.E. 154].  The State Defendants filed a motion for summary judgment.  [D.E. 142.]

On February 8, 2012, the Court held oral argument on all three motions.  [D.E. 189.][3]

_____

[3] At oral argument, counsel for the Plaintiff-Schools stated that he had uncovered a set of Arizona for-profit private schools in which students were participating in the school lunch program.  (*See* Tr. Summ. J. 60:13–19.)  The Federal Defendants requested that the Court stay its decision on these motions pending its investigation and report to the Court on the matter.  [D.E. 191.]  The Court declines to grant a stay.  The comment by Plaintiff-Schools' attorney has no

### III.    Standing

Both sets of defendants contest the Plaintiff-Schools' standing to sue.  Defendants raised standing in their motion to dismiss, and they raise it again now that discovery is completed.

### A.  Standard of Review

Without "Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claim, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (citing *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003)).  Under Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  "The party invoking federal jurisdiction bears the burden of establishing" the elements of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Further, because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.*  Therefore, "[w]hile generalized allegations of injury may suffice at the pleading stage, a plaintiff can no longer rest on such 'mere allegations' in response to a summary judgment motion, but must set forth 'specific facts' by affidavit or other evidence."  *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007) (quoting *Lujan*, 504 U.S. at 561 (quoting *Fed. R. Civ. P.* 56(e))).

### B. The Plaintiff-Schools' Standing

To demonstrate that they have carried the burden of establishing standing to sue, the Plaintiff-Schools must satisfy three elements.  First, they "must have suffered an injury in fact —

---

support in the summary judgment record, and the Court does not rely upon it in deciding these motions.  [D.E. 191–193.]

an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual

or imminent, not conjectural or hypothetical." *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d

Cir. 2011) (quoting *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478,

484–85 (3d Cir. 1998)).  Second, the Plaintiff-Schools must demonstrate "a causal connection

between the injury and the conduct complained of — the injury has to be fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some third

party not before the court."  *Id.* (citation omitted).  Third, "it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."  *Id.* (citation

omitted).

### 1.  Injury-In-Fact

Although necessary for an Article III court to exercise jurisdiction, the threshold for an

injury-in-fact is not high, and it is met "as long as the party alleges a specific, identifiable trifle

of injury, or a personal stake in the outcome of [the] litigation."  *In re Global Indus. Techs.*, 645

F.3d 201, 210 (3d Cir. 2011) (internal citations and quotation marks omitted).  The requirement

of an injury "exists to ensure that litigants have a 'personal stake' in the litigation," thus

preventing "the judicial branch from encroaching on legislative prerogatives."  *Danvers Motor

Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (citations omitted).

The record establishes that the Plaintiff-Schools suffered a decrease in enrollment since

the defendants eliminated the workaround.  It further reflects that the Plaintiff-Schools have

increased their tuitions since that time, thus affecting their ability to compete with their non-

profit counterparts.  These injuries suffice to meet the fairly minimal standards for establishing

an injury-in-fact under Article III.[4]  The more pressing question — the question that the parties more vehemently dispute — is whether the decrease in enrollment is fairly traceable to the elimination of the workaround.

### 2.  Causation

The second element of standing is that plaintiff's injury must "be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Adams*, 653 F.3d at 304 (citations omitted).  The specific inquiry into causation for standing purposes is not like the determination of causation in, for example, a tort action.  *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 257 (3d Cir. 2005) (quoting *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)).  The Court only "must ascertain whether the alleged injury-in-fact is causally connected and traceable to an action of the defendants."  *See The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000) (citing *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152–53 (3d Cir. 1999)).

In identifying the cause of the drop in enrollment and revenue, the Plaintiff-Schools rely on the report and testimony of their expert witness, Robert H. Davis, and the raw enrollment numbers the report is based upon.[5]  (Pls.' Br. Opp. Federal Defs.' Mot. Summ. J. 13–20.)  The data contained within Davis's report, and the conclusions that he draws from those data, provide

---

[4] Because the Court is satisfied that the decline in enrollments and competitive disadvantages constitute injuries-in-fact sufficient to form the basis for standing, it need not address the Plaintiff-Schools' alternative argument that an injury-in-fact exists based on the need to reorganize their affairs in light of the inability to use the workaround (*See* Pls.' Br. Opp. to Federal Defs.' Mot. Summ J. 13–15.)

[5] As set forth *infra*, the Court is denying the Federal Defendants' motion to strike the reports of plaintiffs' experts.

a sufficient basis to satisfy the Court that the Plaintiff-Schools' injuries are fairly traceable to the defendants' conduct.

Davis reviewed financial data on the food service programs at the Plaintiff-Schools, the average daily enrollment at the Plaintiff-Schools, the tuition billed to the school districts, the Plaintiff-Schools' interrogatory responses, and audit reports for the Plaintiff-Schools from the fiscal years 2006, 2007, 2008, and 2009. (Davis Rep., appended to Liss Cert., Ex. 3, at 5 ("Davis Rep.").) Davis noted that during those four fiscal years, when the workaround was in effect and then not in effect, revenue from food service sales decreased 20% and the cost of food supplies and materials increased 106%.[6] (*Id.* at 6.) During that same period, the combined average tuition at the schools increased 15% and enrollment decreased 10%. (*Id.*) Of the average $7,102 per-pupil tuition increase over those four years, $222 is attributable to the need to charge food service deficits to tuition. (*Id.*)

Davis prepared a spreadsheet in conjunction with his analysis. It shows that at Glenview Academy, for example, in the fiscal year 2006, food expenditures amounted to $11,877, and after subtracting $5,608 earned in student sales, the remaining $6,269 had to be charged to tuition at a cost-per-pupil of $83.36, for a total tuition of $49,641. (*Id.* at 8.) In the fiscal year 2009, however, those numbers were quite different, as food expenditures rose to $17,458, and after subtracting just $54 earned in student sales, the remaining $17,404 had to be charged to tuition at a cost-per-pupil of $419.78, for a total tuition of $57,885. (*Id.*)

Davis's report establishes that the Plaintiff-Schools have generally been charging more money for food services as part of tuition since the workaround ended; that tuition has generally

---

[6] Davis's statistics included the New Beginnings School, which is operated by KDDSIII, Inc. On August 25, 2011, KDDSIII, Inc. consented to voluntary dismissal after determining that it has not suffered sufficient harm to establish standing. [D.E. 177.]

increased in that same time; and that enrollment has generally declined.[7]  (*See id.* at 8–9.)  The report also identifies a "spiral effect":  when a student withdraws, the Plaintiff-School must spread the loss in tuition across the remaining students.  (*Id.* at 11.)

The Federal Defendants argue that the report falls short of establishing direct causation, i.e., that the increase in food costs attributable to the workaround's elimination is responsible for the Plaintiff-Schools' enrollment dip.  However, for standing purposes, causation requires only that the injury "be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Adams*, 653 F.3d at 304 (citations omitted).  Davis's report contains a conclusion section which explains how the Plaintiff-Schools meet this requirement.  After finding the increase in tuition to be a "contributing factor in the increased tuitions," Davis describes the rising percentage of tuition increases resulting from food service as having a "disproportionately large impact" on the financial condition because it puts them at "a competitive disadvantage" with those non-profit private schools that continue to receive the federal meal subsidies.  (*Id.*at 21.)  Cost of tuition, Davis's report establishes, is a major concern to the sending districts, making the 14% difference in cost of tuition between the for-profit and non-profit private schools enough of a game changer to account for the decreased enrollment in the Plaintiff-Schools.  (*See id.* at 10–11.)

As discussed above, "each element [of standing] must be supported in the same way as any other matter on which plaintiff bears the burden of proof, i.e., with the manner and degree of

_____

[7] The Court describes these trends as occurring "generally" because exceptions exist.  For example, the Gramon School charged less food services costs to tuition in the fiscal year 2009 than it did in the fiscal year 2008, and the average daily enrollment at Glenview Academy increased from the fiscal year 2008 to the fiscal year 2009.  (Davis Rep. 8.)  Unfortunately, even though the report includes spreadsheets that break down the finances of each individual school, neither Davis nor the briefs analyze the Plaintiff-Schools' post-workaround position individually rather than cumulatively.

evidence required at the successive stages of litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. at 561.  The case currently rests at the summary judgment phase, where inferences drawn from facts in the record "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting *Fed. R. Civ. P.* 56(e)).  The Court considers it to be a reasonable inference that in tough economic times, rising tuition costs will affect enrollment decisions, both as a general matter and especially from a competitive standpoint, as the Plaintiff-Schools must now bear a cost in their tuition that they did not previously need to bear.  Thus, despite the Federal Defendants' expert analysis indicating that the food-related tuition increases are insufficient to make a difference in placement decisions, the Court declines to engage in a battle of the experts at this phase of the litigation.  The record permits the Court to reasonably infer that the drop in enrollment and the schools' competitive disadvantages are "fairly traceable" to the elimination of the workaround, and causation for standing purposes is therefore established.

### 3.  Redressability

The third prong of the inquiry into the Plaintiff-Schools' standing is that it "must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Adams*, 653 F.3d at 304.

The Federal Defendants argue that plaintiffs have not established redressability because "the operation of the workaround depended on the Montclair School District . . . being willing to act as plaintiffs' sponsor" and "[n]either Montclair nor any other entity that participates in the programs . . . has an obligation to sponsor plaintiffs."  (Federal Defs.' Br. Supp. Mot. Summ. J. 13–14.)  The Court finds this argument needlessly formalistic.  From the time that they first began participating in the workaround, the Plaintiff-Schools maintained a relationship with a

sponsor until the workaround was eliminated in 2007.  The Court sees little benefit to be gained from requiring an affidavit or letter from a public school district indicating a willingness to continue participation as a sponsor, as the historical backdrop establishes that it is likely, and not merely speculative, that the Plaintiff-Schools would be able to locate a sponsor, just as the Deron School did for over two decades before the workaround ended.

Also on the issue of redressability, the State Defendants argue that they "lack the authority and jurisdiction to grant Plaintiffs the relief they seek" because NJDOA has entered a contract with the USDA to administer the meals programs, and that contract requires the State to adhere to federal interpretations of the pertinent statutes and regulations.[8]  (State Defs.' Br. Supp. Mot. Summ. J. 12.)  The NJDOE was responsible for administering the programs until 1997, when the NJDOA took over that responsibility.  (State Defs.' Stmt. Material Facts ¶ 8–9; Pls.' Resp. Stmt. Material Facts ¶ 8–9.)  In April 2009, the NJDOA and the USDA entered into a contract providing for the programs' operations, which requires that the NJDOA "provide the funds and commodities in accordance with program statutes, program regulations, any FNS instructions, policy memoranda, guidance, and other written directives interpreting the program statutes and program regulations, and the other statutes and regulations cited in the agreement." (*See* State Defs.' App., Collier Cert., Ex. B.)  The contract further requires the NJDOA to comply with nondiscrimination statutes including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.  (*Id.*)

---

[8] Though the State Defendants present this as a separate point, in substance, this argument is essentially that plaintiffs have failed to satisfy the redressability prong of the standing inquiry in relation to the State Defendants.  *See Adams*, 653 F.3d at 304 (noting that third prong of inquiry into standing is that it "must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").

The Court appreciates that the State Defendants cannot, without the assistance of the Federal Defendants, re-implement the workaround.  But this case is not necessarily limited to such a remedy.  Although the Plaintiff-Schools' preferred remedy is re-implementation of the workaround, at the end of the day what they want is an accommodation.  The State Defendants play an integral role in the implementation of the meals programs; indeed, the states bear much of the actual responsibility for administering the programs.  It thus makes sense for all the State Defendants to remain a party to the case to ensure that, if the Plaintiff-Schools prevail, complete relief may be afforded.  Ultimately, what, if any, specific role the State Defendants could or would play in a favorable outcome for the Plaintiff-Schools is not clear from this record, nor need it be at the present time.  *Cf. Grieco v. N.J. Dep't of Educ.*, No. 06-4077, 2007 WL 1876498, at *11 (D.N.J. June 27, 2008) (Sheridan, J.) (dismissing official-capacity individual defendants because "the real party in interest" was still defendant in suit, but retaining claims against some officers after "considering the nature of relief sought and the manner of enforcement of any future court order"). [9]

### 4.  Conclusion on Standing

For the foregoing reasons, the Court finds that the Plaintiff-Schools have carried their burden of establishing standing to sue under Article III.

## C.  Third-Party Standing

---

[9] The State Defendants argue that NJDOE has not been responsible for the administration of the meals programs since 1997, and that it lacks authority or jurisdiction to reinstate the workaround. (State Defs.' Br. Supp. Mot. Summ. J. 12.)  A more complete explanation of the repercussions of the transfer and the NJDOE's present role, if any, in administering the matters at hand here, may be available through testimony at trial.  At the end of litigation, the Court can tailor relief, if any, to the appropriate parties.  For the same reason, the Court declines to grant summary judgment on the claims against the state officers.

A plaintiff may ordinarily bring claims only on its own behalf, but under certain circumstances it may be entitled to assert the rights of another party not before a court. *See Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). "To successfully assert third-party standing: (1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3) the third party must face some obstacles that prevent it from pursuing its own claims." *Interactive Media Entm't & Gaming Ass'n v. Attorney Gen.*, 580 F.3d 113, 118 (3d Cir. 2009) (citing *Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003)). Additionally, the third party must have independent third party standing to sue, *see Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 37 (1st Cir. 1990), and there must be sufficient alignment of the plaintiff's interests with the interests of the third party so that relief for one would mean relief for the other, *see Craig v. Boren*, 429 U.S. 190, 196–97 (1976).

The Federal Defendants' claim that the students have not suffered an injury-in-fact regurgitates arguments in their motion to dismiss, which the Court denied. They contend that the students have not suffered an injury because they have been getting practically identical meals from the school district, and that they have not suffered a statutory harm because they attend a school that is plainly not covered by the NSLA and the CNA. (Federal Defs.' Br. Supp. Mot. Summ. J. 18–20.) In rendering its decision on the Federal Defendants' motion to dismiss, the Court explained:

> I see no reason to say they're stripped because another way of feeding them has been found. If, in fact, the [w]orkaround was some kind of a kindness of strangers accommodation which is sort of where I think the government's argument leaves the students, then I don't think this lawsuit would have the force and effect that it has. The Workaround appears to be an accommodation of the obligations not to discrimination. That the Rehabilitation Act thrusts upon anything that it touches. And the cold hard facts that the school lunch program has this exclusivity piece to it. And it rearranged the way in which the sending distracts and the for-profit

19

private schools line themselves up to provide for eligibility.  And there is evidence that's relied on for purposes of framing the complaint, that this was acknowledged as an appropriate way of dealing with the arguably competing or intention rights that are involved and the statutory exclusion that exists.

So I find that the injury exists insofar as the students are being thrust into being at the mercy of the kindness of strangers or whatever comes along.  And that ultimately this is not a proper support for a right that they have under the National School Lunch Program.  Whether it falls apart this year or two years from now, they should have the same firm underpinning as exists with students going directly to public schools.  So I find that the complaint alleges sufficient injury to provide the necessary standing element.

(Tr. of Mot. Dismiss Op. 55:19–56:20.)

The Federal Defendants do not offer a rebuttal to this argument other than to say that the sending school district is not a "stranger" to the students.  (Federal Defs.' Br. Supp. Mot. Summ. J. 19.)  They otherwise argue the merits of the case to rebut the Court's assertion that the students were deprived of a statutory right.  (*Id.* at 18–19.)  But this would "take us into a discussion of the merits of [the] claims, something separate from the standing inquiry."  *Marion v. TDI, Inc.*, 591 F.3d 137, 149 (3d Cir. 2010) (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.")).  Therefore, the Federal Defendants' argument that the students have not suffered an injury-in-fact fails.

The Federal Defendants also argue that the students do not face an adequate obstacle to asserting their own rights.  But the Court rejected this argument when the Federal Defendants made their motion to dismiss.  As the Court held:

[I]f not this group of plaintiffs then who[?]  I don't see that we have individual students who could be heard.  And I don't find that we have to foist on parents the responsibility of talking about this[. T]heir children by . . . being in this state and being eligible to go to

20

> school, by virtue of their . . . age and where they live, have a right
> to the National School Lunch Program.  Pure and simple.  They
> shouldn't have to litigate for them.

(Tr. of Mot. Dismiss Op. 57:11–19.)

The Federal Defendants cite *Kowalski v. Tesmer*, 543 U.S. 125 (2004) for the proposition

that indigence alone does not create a barrier to a third party's ability to bring suit.  But when

examined closely, that decision turned largely on the fact that the plaintiffs, who were attorneys

seeking to challenge Michigan's procedure for appointing appellate counsel for indigent criminal

defendants, were not sufficiently close to the yet-unascertained potential clients on whose behalf

they sought to sue.  *See Kowalski*, 543 U.S. at 134 & n.5.  Here, the hindrance to the students'

ability to sue is not based solely on their indigence.  It is also predicated on the fact that the

injury that plaintiffs allege they have suffered is one that appears "on paper" but that is not

reflected in practical terms because the school district has picked up the tab for the students'

meals.  When taking into account that students may not spend an extended time in the schools

and are subject to be moved to another school, little motivation exists for any individual student

or parent to bring suit.[10]

The Federal Defendants attempt to rebut the existence of an obstacle to suit by pointing

to *C.D. v. New York City Department of Education*, No. 05-7945, 2009 WL 400382 (S.D.N.Y.

Feb. 11, 2009), in which the mothers of two students brought suit when the public school system

placed their children in private schools where they could not receive free meals.  But there, the

children's parents' were quite literally preparing the children's meals to bring to school.  *C.D.*,

2009 WL 400382, at *3–4.  Here, the students have never been denied a meal and are alleging

---

[10] The Federal Defendants take the Plaintiff-Schools to task for not informing the students and
their families about this lawsuit and for refusing to turn over certain information about the
students during discovery.  There are interests of privacy that the Plaintiff-Schools appropriately
seek to protect, which should not be overlooked in examining third party standing.

harm in the form of a denial of statutory rights; by contrast, the *C.D.* plaintiffs faced an immediate economic hardship and thus had greater incentive to protect their rights.

Finally, the Federal Defendants argue that the parties are not sufficiently aligned because the plaintiffs have an interest in not having to charge sending districts for meals while the students have no actual interest because the only question to be adjudicated for them is whether the federal government or the school district will pay for their meals.  (Federal Defs.' Br. Supp. Mot. Summ. J. 23.)  This argument, however, entirely disregards the difference between a school district that voluntarily pays the cost of free meals and a federal program that protects the right to free meals by statute.  Although the parties may face different harms, their interests are nevertheless aligned because each can gain stability and permanency that they do not have under the present scheme.

For the foregoing reasons, plaintiffs have established standing to sue on behalf of both themselves and their students.

## IV.    Claims on the Merits

With standing established, the Court turns to the merits-based arguments for summary judgment.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In determining the existence of a genuine dispute as to a material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather, the fact in dispute must be genuine, meaning that a reasonable factfinder could find the fact in favor of the nonmoving

party, and it must be material, meaning that it "might affect the outcome of the suit under the governing law." *Id.* at 248.

### A. Rehabilitation Act Section 504

### 1. Private Right of Action

The Federal Defendants argue that plaintiffs cannot assert a claim against them under the Rehabilitation Act because the Act provides no private right of action. (Federal Defs.' Br. Supp. Mot. Summ. J. 27–29.) The Plaintiff-Schools respond that the Third Circuit expressly recognized a private right of action in *Three Rivers Center for Independent Living v. Housing Authority of the City of Pittsburgh*, 382 F.3d 412 (3d Cir. 2004). (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 27–29.)

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." Rehabilitation Act section 505(a), codified at 29 U.S.C. § 794a(a)(2), sets forth private remedies available under the Act. Specifically, it states that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." In *Three Rivers Center*, the Third Circuit held that regulations promulgated pursuant to section 504 may be the basis for a private right of action provided that the regulations "create[] a personal right," which is to say they set forth "rights

[that] inhere in the individual" because "they are 'individually focused'" and "create 'individual entitlements.'"  382 F.3d at 419, 426.

The Federal Defendants do not contest that the regulations relevant to this claim create personal rights.  Rather, they argue that an action cannot be brought against a federal agency, reasoning that the Rehabilitation Act's remedies provision merely adopts by reference Title VI's remedies, and that because Title VI does not afford a remedy against federal agencies outside of the employment context, neither may the Rehabilitation Act.  (Defs.' Br. Supp. Mot. Summ. J. 27–28.)  For support, they cite *NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1255 n.27 (3d Cir. 1979), in which the Third Circuit held that although "a beneficiary may sue a recipient of federal funding under section 601 [42 U.S.C. § 2000d] for a judicial declaration that the recipient's conduct is in violation of" that provision, "the beneficiary may not sue the administrative agency under section 601" because such a suit would enable the beneficiary "to circumvent the limitations of sections 602 and 603, and would be in a position to, in essence, compel funding termination — which is an impermissible result."  The panel reasoned that this framework allows a beneficiary "to vindicate his section 601 rights without invoking the executive's power to terminate funds" by putting the onus on the recipient either to cease the discriminatory practice or decline federal funding.  *See id.*

The Federal Defendants' argument disregards a critical difference in the statutory frameworks.  Title VI provides that no person, as a result of discrimination, may "be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  By contrast, the Rehabilitation Act's remedies provision explicitly states that the Title VI remedies are available "to any person aggrieved by any act or failure to act by any recipient of Federal assistance *or Federal provider of such*

24

*assistance* under section 794 of this title." 29 U.S.C. § 794a(a)(2) (emphasis added).  Because

the Rehabilitation Act's remedies provision directly contemplates a plaintiff taking action as a

result of a federal agency's violation in a way that Title VI does not, the Court finds that a

private right of action against them exists under the Rehabilitation Act.

### 2. Substantive Rehabilitation Act Arguments

As noted above, section 504 of the Rehabilitation Act provides that "[n]o otherwise

qualified individual with a disability in the United States, as defined in section 705(20) of this

title, shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance or under any program or activity conducted by any Executive agency

. . . ." 29 U.S.C. § 794(a).  To establish a prima facie case under the Rehabilitation Act, "a

plaintiff must demonstrate that: (1) she is a 'handicapped individual' under the Act; (2) she is

'otherwise qualified' for the position sought; (3) she was excluded from the position sought

solely by reason of her handicap; and (4) the program or activity in question receives federal

financial assistance." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 198

n.3 (3d Cir. 2008) (emphasis omitted) (citing *Strathie v. Dep't of Transp.*, 716 F.2d 227, 230 (3d

Cir. 1983)).  When, as here, the case involves the opportunity to participate in a federal program

rather than the ability to be employed, the second and third elements are restated to explain that

the plaintiff must be "otherwise qualified to participate in the . . . program" and that the plaintiff

"was denied the benefits of the program or was otherwise subject to discrimination because of

her disability." *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 365 (3d Cir.

2008).

When the test refers to an "otherwise qualified individual," it means "a person who can meet all of a program's requirements in spite of a disability, with or without reasonable accommodation." *Id.* at 366. The plaintiff bears "the burden of proving that a reasonable accommodation . . . would enable her to meet the requirements of [the] program." *Id.* Once a plaintiff identifies an accommodation, "[t]he burden is on the [defendant] 'to show that the required modification entails a substantial alteration'" in the program; if defendant cannot show that the modification would be substantial or would work an undue burden on it, then the person is "otherwise qualified." *Juvelis v. Snider*, 68 F.3d 648, 653 (3d Cir. 1995) (citations omitted).

The Plaintiff-Schools assert a claim against both the Federal Defendants and the State Defendants for violation of the Rehabilitation Act. Here, there is no dispute as to the first and fourth elements: the students are handicapped within the meaning of the Act, and the program is funded by the USDA and administered by NJDOA. The disputes arise over whether the students are "otherwise qualified" and whether they have been excluded solely by reason of their handicaps.

### a. "Otherwise Qualified"

The Federal Defendants argue that the students are not "otherwise qualified" because they do not meet the eligibility requirements regardless of their disabilities; they attend for-profit private schools, and the reason for their treatment is because the statutes exclude students in for-profit private schools from the meals program. (Federal Defs.' Br. Supp. Mot. Summ. J. 30.) The Federal Defendants further argue that no reasonable accommodation would make them qualified because the only accommodation plaintiffs seek is to have the Court disregard the limitation set forth in the NSLA and CNA. (*Id.*) The Plaintiff-Schools respond that section 504 is designed to eliminate precisely these types of statutory distinctions, forged "from 'archaic

26

attitudes and laws' and 'the fact that the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] individuals with handicaps.'"  (Pls.' Br. Opp. to State Defs.' Mot. Summ. J. 27–28 (quoting *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 279 (1987)).)  Therefore, if a literal interpretation of the NSLA and CNA results in a burden on disabled students, then section 504 requires a more flexible approach.  (*Id.* at 29.)

The record permits a reasonable factfinder to determine that the students are "otherwise qualified."  The Federal Defendants' line of reasoning ignores that the placements occurred only because of the students' handicap.  If the students were not disabled, then they would not be disqualified from participating in the programs, because they would still attend public school.

Moreover, even if the students are were not "otherwise qualified," the Court cannot say that no factfinder could find reasonable the proffered accommodation of circumventing the statutory requirements by allowing public school students in a for-profit private school to continue obtaining subsidized meals through the workaround or a different, workaround-like system.  The obligation to comply with the Rehabilitation Act "is not obviated or alleviated by the existence of any State or local law or other requirement that, on the basis of handicap, imposes prohibitions or limits upon the eligibility of qualified handicapped persons to receive services or to practice any occupation or profession."  7 C.F.R. § 15b.9(a).

The necessary inquiry under the Rehabilitation Act is whether the proposed accommodation would fundamentally change the program or cause defendants an undue hardship.  The record does not make clear that it would, and summary judgment is not available to the Federal Defendants.

**b.  Exclusion Solely by Reason of Handicap**

Section 504 of the Rehabilitation Act makes clear that a person may not be discriminated against "solely by reason of her or his disability."  29 U.S.C. § 794(a); *see also Haybarger*, 551 F.3d at 198 n.3.  For substantially the same reason that the students are "otherwise qualified" to participate in the program, the record permits a reasonable factfinder to conclude that they have been subject to discrimination solely by reason of their disabilities.  These are public school students who have been placed in for-profit private schools that have been deemed for years to be adequately meeting their special needs.  If not for their disabilities, the students would be in public schools and would benefit from the NSLA and CNA.  To say that any discrimination has occurred because of their placement and not because of their disability is a distinction without a difference here.

The record does not supply adequate information for the Court to determine whether viable non-profit schools are options for these particular students.  Generally, additional factfinding is necessary for the Court to attain a more complete understanding of the issues at play in placing the students at the Plaintiff-Schools, and summary judgment cannot be granted on the Rehabilitation Act claim.

### 3.  Americans with Disabilities Act

The State Defendants move to dismiss the claims brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.  The framework for this claim is identical to the framework for the Plaintiff-Schools' claim under section 504 of the Rehabilitation Act.  *See Helen L. v. DiDario*, 46 F.3d 325, 330 n.7 (3d Cir. 1995) ("The law developed under section 504 of the Rehabilitation Act is applicable to Title II of the ADA." (citing *Easley v. Snider*, 36 F.3d 297 (3d Cir. 1994); 28 C.F.R. § 35.103)).  For the same reasons that summary judgment is denied as to the section 504 claim, it is also denied as to the ADA claim.

28

**B.  Administrative Procedure Act (against Federal Defendants only)**

**1.  APA Standing**

The Federal Defendants assert that the Plaintiff-Schools lack prudential standing to bring their claim under the APA because they cannot demonstrate that they are in the same "zone of interest" as their students.  (Federal Defs.' Br. Supp. Summ. J. 24–25.)  The Supreme Court has described the "zone of interest test" as designed to assess "whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  To that end, "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Id.*  "The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Id.* at 399–400.  As a result, general implicit policies will suffice to identify an interested party.  *Id.* at 399 n.14.

The Federal Defendants argue that plaintiffs' only interest is increasing their own enrollments and that this is inconsistent with congressional goals because the statute expressly excludes for-profit schools like them from participating in the meals programs.  (Federal Defs.' Br. Supp. Mot. Summ. J. 25.)  The Plaintiff-Schools counter that the NSLA and the CNA are designed to ensure that children receive meals so that they can have the ability to participate effectively in their education.  (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 29.)  In the preamble to the NSLA, Congress declared a policy "to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural

29

commodities and other food, by assisting the States, through grants-in-aid and other means, in providing an adequate supply of foods and other facilities for the establishment, maintenance, operation, and expansion of nonprofit school lunch programs." 42 U.S.C. § 1751. Similarly, the CNA's preamble proclaims a "recognition of the demonstrated relationship between food and good nutrition and the capacity to develop and learn," and declares a congressional policy of enhancing and improving the NSLA's goals. 42 U.S.C. § 1771. In implementing these statutory schemes, Congress referred to a goal of ensuring children's nutrition as a means to the end of ensuring more productive school experience.

The Federal Defendants suggest that this reading of the statute's purpose is too broad because the proper focus of the zone of interest test is the operative section, not the more general goals of the overall Act. (Federal Defs.' Reply Br. Further Supp. Mot. Summ. J. 9 (citing *Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 529–31 (1991)).) They are correct that the focus must be narrower than the Plaintiff-Schools suggest, but even under a focused reading, the Plaintiff-Schools' position is more tenable. The statutes at issue address eligibility, as does the USDA interpretation of the statute that plaintiffs challenge. 42 U.S.C. §§ 1760(d)(5), 1784(3). Congress excluded for-profit schools from the definition of eligible schools, but the challenge in this case involves students who are enrolled in public school systems and placed in for-profit private schools only because of their disabilities. Thus, this case involves for-profit schools that are facially ineligible under the controlling statute, but that also are in the unique position of educating and being responsible for ensuring the well-being of students who, if left in public school, would have been eligible for federal subsidies under the Act. The Plaintiff-Schools, as a result of their unique subset of students, are parties "arguably" protected by the statutory scheme at issue, even if the statute was not "specifically

intended to benefit" them.  *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522

U.S. 479, 492 (1998), *superseded by statute on other grounds*, *Am. Bankers Ass'n v. Nat'l Credit

Union Admin.*, 271 F.3d 262, 265 (D.C. Cir. 2001).  The Court, therefore, is not persuaded that

plaintiffs' interests are "so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke*,

479 U.S. at 399.  Accordingly, the Court finds that the Plaintiff-Schools have carried their

burden of demonstrating prudential standing to bring a claim under the Administrative Procedure

Act.

### 2.  Substantive APA Claims

The APA claims are analytically distinct from the other claims, as they involve an

analysis of the administrative record to determine whether the USDA's decision was arbitrary

and capricious and whether the decision required a notice and comment period.  Consequently,

logic and efficiency weigh in favor of denying, without prejudice, the Federal Defendants'

motion for summary judgment on the APA until after the bench trial is decided.

### C.  Mandamus (against Federal Defendants only)

The Plaintiff-Schools allege in their complaint that because the Federal Defendants

permitted plaintiffs to use the workaround, its termination "following Defendants' explicit and

tacit approval of the same, constitutes a usurpation of judicial power by Defendants."  (Compl.

¶ 169.)  The Plaintiff-Schools argue that they have a clear right to relief and no adequate remedy

at law, and that the Court should issue a Writ of Mandamus under the All Writs Act, 28 U.S.C.

§ 1651.  (*Id.* ¶ 171.)

The All Writs Act provides that "all courts established by Act of Congress may issue all

writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages

and principles of law." 28 U.S.C. § 1651(a). "The writ of mandamus has traditionally been used to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *In re Ntreh*, 401 F. App'x 686, 687 (3d Cir. 2010) (citing *In re Patenaude*, 210 F.3d 135, 140 (3d Cir. 2000)). To obtain the writ, a plaintiff "must show that he has no other means to attain the desired relief and that the right to a writ is clear and indisputable." *Id.* (citing *Patenaude*, 210 F.3d at 141).

The writ has been described as "a drastic remedy that is seldom issued," and "its use is discouraged." *Id.* (quoting *Patenaude*, 210 F.3d at 140). The Court easily finds that mandamus is inapplicable to the present circumstances. The Plaintiff-Schools' numerous other claims demonstrate that they have other means to obtain their desired relief. Additionally, their right to the relief is not "clear and indisputable."

The Plaintiff-Schools cite *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001), but that case arose in an entirely different context. There, the Ninth Circuit acknowledged that common law writs may be used to fill gaps in federal statutory frameworks, but the case was limited to a discussion of the federal framework for postconviction relief and spoke specifically to common law writs such as *coram nobis* and *audita querela*. *See Valdez-Pacheco*, 237 F.3d at 1079. The case did not go so far as to suggest that federal courts may use their authority under the All Writs Act to fill gaps each and every time that they appear.

Accordingly, the Federal Defendants' motion for summary judgment on the plaintiffs' claim for mandamus is granted.

### D. Equal Protection (against Federal and State Defendants)

The parties disagree over both the applicable standard of review and the application of that standard to the facts of this case. The Plaintiff-Schools allege that the termination of the

workaround creates two classes of students that are being treated inequitably: "those without disabilities who may attend public school and receive federally subsidized meals in school, and those with disabilities who have been placed by their IEP teams in approved schools, which happen to be for-profit entities, to receive the appropriate special education programs and services to which public school students are entitled." (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 40.)

### 1. Level of Scrutiny

The "first step in analyzing equal protection claims is to determine the appropriate level of scrutiny." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003) (citing *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 314 (3d Cir. 1999) (en banc)). Two possible levels of scrutiny are applicable here. "Under rational basis review, a classification will be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *United States v. Lopez*, 650 F.3d 952, 960–61 (3d Cir. 2011) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). If that standard applies, "[t]he party challenging the classification bears the burden to negate 'every conceivable basis which might support it[.]'" *Id.* at 961 (quoting *Heller*, 509 U.S. at 320). If intermediate scrutiny applies, the State must assure the Court "that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." *Doe v. Plyler*, 457 U.S. 202, 217–18 (1982).

The determination of the appropriate standard turns on whether the government's action disadvantages a "suspect class" or impinges upon a "fundamental right." *Id.* at 216–17. The Supreme Court has held that "[e]ducation . . . is not among the rights afforded explicit protection under our Federal Constitution," nor is it "implicitly so protected." *San Antonio Indep. Sch. Dist.*

*v. Rodriguez*, 411 U.S. 1, 35 (1973).  Moreover, though this case involves students with disabilities, the Supreme Court held in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985) that disability is not a suspect class, and the parties do not dispute that this holding applies to the students in this case.

The Plaintiff-Schools argue that intermediate scrutiny should apply, reasoning that the Supreme Court's holding in *Doe v. Plyler*, 457 U.S. 202, mandates heightened scrutiny when "important governmental services [are] withheld from a discrete class of innocent citizens." (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 41–42.)  In *Plyler*, the Court addressed the constitutionality of a Texas statute that withheld "from local school districts any state funds for the education of children who were not 'legally admitted' into the United States" and that "authorized local school districts to deny enrollment in their public schools to students not 'legally admitted' to the country.'"  457 U.S. at 205.  The Court's determination of the appropriate level of scrutiny began with its observation that there exists "a substantial 'shadow population' of illegal immigrants — numbering in the millions — within our borders," and that such people are often "denied the benefits that our society makes available to citizens and lawful residents."  *Id.* at 218–19.  "The existence of such an underclass," the Court noted, "presents most difficult problems for a Nation that prides itself on adherence to principles of equality under the law."  *Id.* at 219.  The Court further noted that "[t]he children who are plaintiffs in these cases are special members of this underclass" because unlike their parents, the children's presence in this country is not attributable to their own unlawful conduct.  *Id.* at 219–20.  And because education is such a pivotal part of advancing in society, "by depriving the children of any disfavored group of an education, we foreclose the means by which that group might raise the level of esteem in which it is held by the majority."  *Id.* at 222.  Therefore, because the Texas

law "impose[d] a lifetime hardship on a discrete class of children not accountable for their disabling status," the Court held it appropriate to "take into account [the law's] costs to the Nation and to the innocent children who are its victims," thus making heightened review necessary to ensure that the law "furthers some substantial goal of the State." *Id.* at 223–24. Subsequent cases expounding on the Court's reasoning have held that "[i]t was the 'unique circumstances' of a burden on education coupled with the disadvantaging of children of aliens that led to heightened scrutiny.'" *Phila. Police & Fire Ass'n for Handicapped Children, Inc. v. City of Phila.*, 874 F.2d 156, 165 (3d Cir. 1989); *see also Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 459 (1988) (noting that *Plyler* has not been extended "beyond the 'unique circumstances' that provoked its 'unique confluence of theories and rationales'") (citations omitted)).  Accordingly, the Court concludes that the proper standard of review here is rational basis.  .

### 2.  Applying Rational Basis

The Federal Defendants argue that the government may rationally distinguish public schools and non-profit private schools from for-profit private schools because the government is under no obligation to permit students in private schools to share in all benefits that students in public schools enjoy and because non-profit schools and for-profit schools have different interests and goals that could render them subject to differing frameworks.  (Federal Defs.' Br. Supp. Mot. Summ. J. 35–36 (citing *Norwood v. Harrison*, 413 U.S. 455, 462 (1973); *Dumas v. Kipp*, 90 F.3d 386, 392 (9th Cir. 1996)).)  The Plaintiff-Schools argue that it would be entirely irrational to deny a form of funding to public school students in one type of school while granting it to public school students in another type of school.  (*See* Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 44–45.)

The record does not support a finding that the termination of the workaround ran afoul equal protection.  The fact that Congress sometimes agrees that for-profit schools are entitled to federal subsidies is beside the point because the equal protection clause does not prevent Congress from making different decisions on different policies provided that some rational basis exists for doing so.  As the Ninth Circuit has said: "Nonprofit and for-profit schools have diverging interests and goals.  Because they function under very different economic and market forces, they may require different regulatory treatment."  *Dumas*, 90 F.3d at 392.

Indeed, the premise of the Plaintiff-Schools' equal protection claim would necessarily cast aside the workaround.  Taken to its logical conclusion, the Plaintiff-Schools' argument would mean that whenever the government provided a benefit to any public school student anywhere, it would be required to provide the same benefit to all public school students everywhere.  This would not only make the workaround a needless complication, it would establish a radical standard without any support in equal protection jurisprudence.

### 3.  State Equal Protection Claim (against State Defendants only)[11]

The New Jersey Supreme Court has read a right to equal protection into article 1, paragraph 1 of the New Jersey Constitution.  *See Lewis v. Harris*, 188 N.J. 415, 467–68 (2006).  The State analysis differs from its federal counterpart.  Under New Jersey law, "a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide

---

[11] The complaint asserts two counts against the Federal Defendants for violations of the New Jersey Constitution's equal protection guarantee.  (Compl. ¶¶ 172–83.)  The Federal Defendants correctly assert that under the Supremacy Clause of the United States Constitution, *U.S. Const.* art. I, cl. 2, federal statutes and agency rules and regulations may not be invalidated due to a violation of state law.  *See New York v. FCC*, 486 U.S. 57, 64 (1988); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986).  Moreover, although the Plaintiff-Schools have not formally abandoned the state law equal protection claims against the federal government, they have implicitly done so.  Their opposition brief does not respond to the Federal Defendants' argument on this issue, nor did they respond to the same argument presented in the Federal Defendants' motion to dismiss.

whether the State action is arbitrary.  In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial." *Id.* at 468 (quoting *Robinson v. Cahill*, 62 N.J. 473, 492 (1973)).  To that end, a court should "consider the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Id.* (quoting *Sojourner A. v. N.J. Dep't of Human Servs.*, 177 N.J. 318, 333 (2003)).  The New Jersey Supreme Court has noted that "although our mode of analysis differs in form from the federal tiered approach, the tests weigh the same factors and often produce the same result." *Sojourner A.*, 177 N.J. at 333.

Here, the affected right is the right to receive federally subsidized meals, the restriction intrudes upon the right by eliminating it for students who attend for-profit private schools, and the public need for the restriction is the State's need to continue receiving federal subsidies for school lunch programs.  With these factors as a backdrop, the equal protection claim against the State Defendants must fail, as the State has an even stronger articulated governmental interest in its decision than the federal government.  The State ended the workaround because it had to choose between removing some students from eligibility and risking a forfeit of overall participation in the NSLA and CNA meals programs.  Because the State Defendants have a strong interest in ensuring a means of financing breakfast and lunch programs for needy students, their decision to follow the federal demands was not arbitrary and did not violate the state equal protection rights of either the students or plaintiffs.

For the foregoing reasons, summary judgment is granted as to the Plaintiff-Schools' State and Federal equal protection claims.

### E.  Individuals with Disabilities Education Act (against State Defendants only)

The Court now turns to the Plaintiff-Schools' claim under the Individuals with Disabilities Education Act ("IDEA").

### 1. Rooker-Feldman Doctrine

The State Defendants assert that the Rooker-Feldman doctrine bars the Plaintiff-Schools from bringing this case because they brought an IDEA claim in state court only to have it dismissed for failure to exhaust administrative remedies.  (State Defs.' Br. Supp. Mot. Summ. J. 22–23.)  The Plaintiff-Schools respond that the Rooker-Feldman doctrine is inapplicable because the state action addressed a different issue, the Plaintiff-Schools are not complaining of injuries caused by the state judgment, and the Plaintiff-Schools have not invited the Court to review and reject the state court judgment.  (Pls.' Br. Opp. to State Defs.' Mot. Summ. J. 22–25.)

The Rooker-Feldman doctrine is a narrow rule that requires a federal district court to dismiss certain cases even though the court has jurisdiction.  The doctrine "is confined to" a narrow field of cases: those "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Great W. Mining & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011) (same).

In the prior state court litigation, the Plaintiff-Schools brought four counts: violation of the students' right to a thorough and efficient education, violation of the students' state constitutional right to equal protection, violation of IDEA regulations, and violation of the Plaintiff-Schools' state constitutional right to equal protection.  *Deron Sch. of N.J., Inc.*, No. MER-L-451-08 (slip op. at 8–9).  Unlike the present case, in the state litigation the Plaintiff-Schools not only sought re-implementation of the workaround but also sought to enjoin the State

to "allow Plaintiffs to exclude from their cost percentages calculation all expenses relating to the provision of subsidized meals to their students."  (Pls.' State Law Compl. at 14, appended to Collier Cert., Ex. G.)  As earlier discussed, Judge Feinberg dismissed the case for failure to exhaust administrative remedies.  *Deron Sch. of N.J., Inc.*, No. MER-L-451-08 (slip op. at 16–27).

The Rooker-Feldman doctrine is inapplicable because the Supreme Court made clear in *Exxon Mobil Corp.* that the doctrine is to be applied only when plaintiffs are "complaining of injuries caused by state-court judgments."  544 U.S. at 284.  That is not the case here, where these plaintiffs are complaining about an independent harm that the state court declined to address.

### 2.  Administrative Exhaustion

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, is designed, in part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  "Under IDEA, a disabled student is entitled to an Individualized Education Plan (IEP), a specially tailored educational program detailing the student's present abilities, educational goals, and specific services designed to achieve those goals within a stated timeframe."  *Beth V. v. Carroll*, 87 F.3d 80, 82 (3d Cir. 1996) (citing 20 U.S.C. § 1401(a)(20)).  The program's actual implementation is left to the states, which are provided with federal funding "contingent on state compliance with [IDEA's] array of substantive and procedural requirements."  *Id.* (citing 20 U.S.C. § 1412).

To further this system, IDEA requires states to implement procedural safeguards involving the education of children with disabilities.  *See* 20 U.S.C. § 1415(a) ("Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.").  To ensure that those mechanisms are utilized, IDEA further states:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before filing a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) [which require that the State provide an administrative due process hearing upon receipt of a complaint, and a mechanism for administrative appeal] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

New Jersey has enacted regulations consistent with these requirements.  *See* N.J.A.C. 6A:14-2.7.

The State Defendants argue that the Plaintiff-Schools have not exhausted their administrative remedies, and may not pursue the present action against the State Defendants to the extent that it invokes the IDEA, the equal protection clause, the ADA, or the Rehabilitation Act.  (State Defs.' Br. Supp. Mot. Summ. J. 13–17.)  The Plaintiff-Schools argue that exhaustion is unnecessary in light of the systemic relief they seek.  (Pls.' Br. Opp. to State Defs.' Mot. Summ. J. 15–20.)

The Third Circuit has recognized numerous exceptions to the exhaustion requirement, including: (1) exhaustion would be futile or inadequate; (2) the issue is purely a legal question; (3) the administrative agency cannot grant relief; or (4) exhaustion would work "severe or irreparable harm" on a litigant.  *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778–79 (3d Cir. 1994) (citations omitted).  Also, plaintiffs may be excused from the exhaustion requirement "where they allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." *Beth V.*, 87 F.3d at 88.  For example, in *New Jersey Protection & Advocacy, Inc. v. New Jersey Department of Education*, 563 F. Supp. 2d 474, 479 (D.N.J. 2008) (Cooper, J.), advocates for children with disabilities brought a claim alleging that disabled children were denied their right to a free appropriate public education in the least restrictive environment because they were "unnecessarily segregated and denied their right to be educated with children who do not have disabilities, to the maximum extent appropriate."  Plaintiffs demanded the court "compel Defendants to include disabled children in general education classrooms with aids, services, and accommodations, to the maximum extent appropriate." *N.J. Prot. & Advocacy, Inc.*, 563 F. Supp. 2d at 479.  The court denied a motion to dismiss on exhaustion grounds because plaintiffs alleged that "Defendants have systematically failed to comply with the statute's inclusion mandates."  As such, the complaints were not individualized and the desired relief required drastic "restructuring, by judicial order, of the mechanism that the state has in place to meet the needs of students with special educational problems." *Id.* at 486.

Like *New Jersey Protection & Advocacy, Inc.*, the desired relief here is substantial enough to be deemed "systemic" in nature.  Specifically, the IDEA claim "is not premised on the individual needs of particular students, but instead alleges that Defendants have systemically

41

failed" to supply students with the appropriate meals.  *See New Jersey Protection & Advocacy, Inc.*, 563 F. Supp. 2d at 486.

It should also be noted that when Judge Feinberg dismissed the plaintiffs' claim due to failure to exhaust administrative options, the action was narrower in scope.  The Federal Defendants were not being sued at all, the IDEA claims were different, and the numerous claims presented here were not recited in plaintiffs' complaint.  See *Deron Sch. of N.J., Inc.*, No. MER-L-451-08 (dismissing state action, brought under similar facts arising from same workaround decision, for failure to exhaust administrative remedies).  The issues raised here have implications for all the students in the Plaintiff-Schools.  For these reasons, the Court finds that plaintiffs are entitled to forego the ordinary exhaustion requirement.

### 3.  "Related Services"

Procedurally, the Court has found that the IDEA claim survives summary judgment. However, the claim fails on substantive grounds.  The IDEA states that one of its purposes is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and *related services* designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A) (emphasis added).  It is the Plaintiff-Schools' position that the workaround's termination deprives the students of necessary related services.  (*See* Compl. ¶¶ 137–41.)  The term "related service" is defined thus:

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including

42

> rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

> 20 U.S.C. § 1401(26)(A).

The statute's implementing regulations provide more details, but those details are targeted at further defining specific components of the statutory definition. *See* 34 C.F.R. § 300.34.

The State Defendants argue that breakfast and lunch are not "related services" under IDEA and that the Plaintiff-Schools have therefore failed to state a claim. (State Defs.' Br. Supp. Mot. Summ. J. 27–28.) The Plaintiff-Schools' only response to this argument is that "it is well established that the statutory list is not all-inclusive." (Pls.' Br. Opp. to State Defs.' Mot. Summ. J. 39 (citing *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 73 (1999)).)

But a review of the list demonstrates a theme in the type of matters covered. It includes transportation, emphasizing special requirements for students with disabilities, *see* 34 C.F.R. § 300.34(c)(16)(iii), and "developmental, corrective, and other supportive services," the examples of which emphasize the need for ensuring the ability of disabled students to participate meaningfully in their education. In other words, the term "related services" is aimed at ensuring that disabled students receive the special treatment that they need. It does not include matters like meals and nutrition, which all students require to succeed in school, regardless of disability. *See C.D.*, 2009 WL 400382, at *15–17 (analyzing similar claim and concluding that "this regulation is inapplicable to meals programs because of both its plain language and its purpose").

More generally, the IDEA claim is also deficient because the students have continued to receive meals while in private placement. What is being challenged is that the meals are being paid by a different source than they were prior to the workaround's termination. Unlike the

Rehabilitation Act, which focuses on whether discrimination is occurring in the administration of federal programs, the IDEA is squarely targeted at ensuring that students receive a free appropriate public education. The record is devoid of evidence that the quality of that education changes because the source of the payments for meals is now different. For these reasons, summary judgment is granted on the IDEA claim.

### F.  Estoppel (against State Defendants only)

"The essential elements of equitable estoppel are a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." *O'Malley v. Dep't of Energy*, 109 N.J. 309, 317 (1987) (citing *Horsemen's Benevolent & Prot. Ass'n v. Atl. City Racing Ass'n*, 98 N.J. 445 (1985)). The doctrine can be used against the government, but it is rarely so invoked, "particularly when estoppel would 'interfere with essential government functions.'" *Id.* at 316 (citations omitted). It is, however, available "to prevent manifest injustice." *Id.*

The State Defendants argue that because the NJDOA is required to follow USDA directives regarding administration of the meals programs, an order that it must continue to do so "would require NJDOA to ignore its obligations to the federal government and undoubtedly interfere with its ability to continue administering the Meals Programs." (State Defs.' Br. Supp. Mot. Summ. J. 41.)

The Court agrees. The use of estoppel here would not "prevent manifest injustice" because the State Defendants are bound by federal instructions on the program's administration. Moreover, using estoppel here would be especially inequitable and illogical. If the Plaintiff-Schools do not prevail in their claim against the Federal Defendants, then an estoppel finding

would require the State to violate the terms of its agreement with the Federal Defendants, even after a court found the Federal Defendants' actions permissible. Accordingly, summary judgment is granted on the equitable estoppel claim.

### G. Takings (against Federal Defendants only)

The Federal Defendants present two arguments for granting summary judgment on the Plaintiff-Schools' takings claim: first, that the Court lacks jurisdiction because the claim should have been brought in the Court of Federal Claims; and second, that plaintiffs cannot have a protected property interest in a right that exists pursuant to a statute containing eligibility restrictions. (Federal Defs.' Br. Supp. Mot. Summ. J. 45–47.)

#### 1. Tucker Act Applicability

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." In the context of a takings claim, the Tucker Act takes on special significance. Because the Fifth Amendment "does not 'limit the governmental interference with property rights *per se*, but rather . . . secure[s] *compensation* in the event of an otherwise proper interference amounting to a taking'," it follows that "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to a taking." *Carteret Sav. Bank v. Office of Thrift Supervision*, 963 F.2d 567, 583 (3d Cir. 1992) (quoting *First English Evangelical Lutheran Church v. Cnty. of Los Angeles*, 482 U.S. 304, 315 (1987); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127–28

45

(1985)).  Relief for a taking is rooted in money damages, and therefore, "[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner has no claim against the Government for a taking," and therefore "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act."  *Id.* (quoting *Preseault v. ICC*, 494 U.S. 1, 11 (1990)).  A takings claim may be heard in a district court "when monetary damages would be inadequate," as typically occurs when the taking occurred "without statutory authority."  *Id.* at 584.  But a plaintiff "may not avoid the exclusive jurisdiction of the Claims Court simply by framing a complaint to seek non-monetary relief."  *Id.* (quoting *Ne. Sav., F.A. v. Dir., Office of Thrift Supervision*, 770 F. Supp. 19, 24–25 (D.D.C. 1991)).

The Court lacks jurisdiction to hear the taking claim.  The Plaintiff-Schools allege that the regulations "interfere with legitimate property interests" to such an extent "that compensation to the owners of those interests is warranted," and that the taking consists of the loss of reimbursement for the meals programs.  (Compl. ¶¶ 157–62.)  Even assuming that this is a viable claim, it is one for money damages.  The Plaintiff-Schools argue that they "do not primarily seek reimbursement, but rather a determination that the Schools and their eligible students must be permitted to participate in the Meals Programs."  (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 46.)  But to the extent that they assert a taking, injunctive relief is not available.  At most, the taking claim can support monetary relief.  Moreover, the Plaintiff-Schools' use of the word "primarily" to describe their favored relief of re-implementing the workaround belies the flaw in their claim to jurisdiction.  It does not matter that the claim is "primarily" one for injunctive or declaratory relief.  Rather, the pertinent inquiry is whether monetary relief would be "inadequate."  *Carteret Sav. Bank v. Office of Thrift Supervision*, 963 F.2d at 584.  Here, if the

Plaintiff-Schools suffered a taking, monetary relief would make them whole again, and they therefore are bound under the Tucker Act to bring this particular count in the Court of Federal Claims.

### 2.  Protected Property Interest

Even if the Tucker Act did not bar the Court's exercise of jurisdiction, summary judgment would be granted on the merits of the taking claim.  A government-created benefit can become a property interest capable of being the premise of a claim of a due process violation or taking. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972) (citing cases and noting welfare benefits and public college professor tenure as examples).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it." *Id.* at 577.  Instead, the person must "have a legitimate claim of entitlement" to the property, consistent with the "purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate" claims for takings of property.  *Id.* To that end, a plaintiff cannot state a claim that Congress engaged in an unlawful taking by changing the statute when benefits "are not contractual and may be altered or even eliminated at any time."  *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174 (1980).

The Plaintiff-Schools acknowledge that a property interest is voided upon Congress's repeal or modification of the statute creating that interest, but they argue that the present facts are distinguishable because no legislative modification occurred.  (Pls.' Br. Opp. to Federal Defs.' Mot. Summ. J. 46.)  But such reasoning ensures a bizarre result.  Under this logic, if an agency misinterprets a statute in a way that results in more benefits being paid out than is permissible under a statute, as the Federal Defendants contend is the case, then the agency is powerless to stop paying those benefits because the recipients will have gained a property interest, and any

attempt to terminate that would-be property interest becomes a taking.  This effectively gives an agency's error the power of law, unable to be remedied absent explicit consent from Congress.

The Court finds instructive *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166.  Although some of the facts in *Fritz* are distinguishable, the case's core reasoning points to the same outcome.  In *Fritz*, the Supreme Court confronted a challenge to the constitutionality of the Railroad Retirement Act of 1974, which "fundamentally restricted the railroad retirement system" that had been in place under the Railroad Retirement Act of 1937.  449 U.S. at 168–69.  Under the new framework, certain unretired employees lost eligibility for generous retirement benefits that would have been available to them under the old system.  *See id.* at 171–73.  The Court noted that "[t]here is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time."  *Id.* at 174 (citing *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 575 (1979); *Flemming v. Nestor*, 363 U.S. 603, 608–11 (1960)).  If anything, the *Fritz* plaintiffs would have had a stronger claim than the Plaintiff-Schools because their right to the benefit was unambiguous until the law changed.  Although the present claim would remain theoretically viable under the theory that, as a result of one of the other claims asserted in their complaint, the Plaintiff-Schools may have been deprived of benefits to which they have a statutory right, such a conclusion is a mere tautology that would necessarily makes the takings claim duplicative of other substantive claims.

For the foregoing reasons, summary judgment is granted on the takings claim.

## V.     Motion to Strike

The Federal Defendants filed a motion to strike the expert designations and reports of Robert H. Davis and Vito A. Gagliardi.  [D.E. 140.]

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods;
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.[12]

The Supreme Court has held that this Rule "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). To that end, the Rule is read to impose a "standard of evidentiary reliability," and it seeks to ensure reliability because experts are "permitted wide latitude to offer opinions" and therefore must have "a reliable basis in the knowledge and experience of his discipline." *Id.* at 590, 592.

The Court held in *Daubert* that "[f]aced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 593. Numerous factors will play into the reliability of the testimony, including whether the "theory or technique" that the expert used can be tested, *id.* at 593, whether the theory or technique has been subjected to "peer review and publication," *id.*, whether a scientific theory or technique has a "known or potential rate of error," *id.* at 594, and

---

[12] The parties' briefs cite to the Rule effective prior to the December 1, 2011 amendments to the Federal Rules of Evidence. The changes, however, are stylistic and do not alter the outcome.

whether a theory or technique has acquired "general acceptance" in the pertinent scientific community, *id.* These factors, however, are "meant to be helpful, not definitive," and they "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). And although *Daubert* is couched in terms of scientific evidence, its general standards apply to experience-based expert testimony as well. *Id.*

### A. Robert H. Davis

Plaintiffs' first expert witness, Robert H. Davis, has spent much of his career working as the business administrator for school districts across New Jersey. (Davis Report, appended to Mot. to Strike, Ex. 1, at 24.) He presently serves as the Interim School Business Administrator for Hoboken Public Schools. (*Id.*) He has previously served as either business administrator or interim business administrator for Ridgefield Public Schools, West Essex Regional School District, South Plainfield Public Schools, Paterson Public Schools, the Montclair Board of Education, and the Midland Park Board of Education. (*Id.*) From 1992 through 1994, he served as Assistant Commissioner of Education for Finance in the New Jersey Department of Education. (*Id.*) He attained a bachelor of sciences degree in Physics from St. Peter's College in 1963 and a master's degree in Educational Administration from Columbia University in 1967. (*Id.*)

Davis's report states that he was provided with: the Plaintiff-Schools' financial data relating to food service; enrollment data for public schools; the plaintiffs' schools' tuition rates; the defendants' responses to interrogatories; and audit reports for the plaintiffs' schools for the four previous fiscal years. (*Id.* at 5.) From this information, he determined that "[t]he cost of food supplies and materials has increased 106% over" the period in question, that food service

50

deficits charged to tuition total $407,932 and have increased 330% during the studied time period, that average enrollment in the schools has decreased by 10%, and that tuition has increased 15%.  (*Id.* at 6.)

Davis noted that the State's revenues are expected to drop through 2016 and that public school districts are therefore seeking more cost-effective means of providing an education, especially with regard to costly special education programs.  (*Id.* at 13–18.)  The resulting trend is that schools often look to internal options rather than out-of-district placement.  (*See id.* at 19.)  Davis's report concludes that the decline in food service revenue since the end of the workaround has caused "increased operating costs and tuitions," and that the costs of food service have a large impact on the schools' financial condition, especially given the "unparalleled fiscal crisis" and high costs of special education.  (*Id.* at 21.)  Davis alleges that the private schools are at a "competitive disadvantage in attracting public school placement in their programs when compared to those private schools which operate not for profit and therefore continue to receive federal free and reduced-price meal subsidies."  (*Id.*)

The Federal Defendants object to Davis's report because he "opines on numerous topics grounded in economics, including, primarily, whether there is a causal link between the USDA's actions and a decrease in the demand for plaintiff schools' services."  (Br. Supp. Mot. to Strike 13.)  Because Davis has no formal training in economics other than a college class, the Federal Defendants assert that he "falls short of presenting the 'knowledge, skill, experience, training or education' . . . he would need to reach economic conclusions about, for example, whether the small tuition increase that plaintiffs attribute to the USDA's decision has caused a decline in enrollment."  (*Id.* (quoting *Fed. R. Evid.* 702).)  The Federal Defendants also challenge Davis's reliability, given that "he employed no methods or procedures of economics to test his

conclusion" regarding the cause of the drop in plaintiffs' enrollment.  (*Id.* at 15.)  They point out

that he did not consider the school finances that existed prior to the workaround's end.  (*Id.* at 16

n.2.)  The Federal Defendants further argue that many of Davis's opinions are not appropriate

topics for expert witnesses because they are easy for laypeople to understand, e.g., that New

Jersey is in dire financial condition and that factors other than meal costs have contributed to

tuition hikes.  (*Id.* at 19.)

Davis has decades of experience as a business administrator in school districts across

New Jersey.  He has spent his career working on the business side of New Jersey public school

districts.  This experience demonstrates "practical experience to demonstrate that he 'possesse[s]

the minimum qualifications necessary to testify as an expert.'"  *Elock v. Kmart Corp.*, 233 F.3d

734, 743 (3d Cir. 2000).  Davis's professional endeavors have given him helpful specialized

knowledge on matters of New Jersey school financing.  He has based his conclusions on post-

workaround financial data about the plaintiffs' schools, his testimony is premised on reliable

determinations involving straightforward financial decisions, and he has applied his experience

and the facts to reach his determinations.  *See Fed. R. Evid.* 702.  On the question of

qualification, especially at a bench trial, his expertise is sufficient to admit him.

## B.  Vito Gagliardi

Dr. Vito A. Gagliardi attained a bachelor of arts degree in General Elementary Education

at Kean University in 1964, a master's degree in Administration and Supervision at Kean

University in 1967, and a doctorate of education in Educational Administration and Supervision

at Rutgers University in 1977.  (Gagliardi Report, appended to Mot. to Strike, Ex. 3, at App'x

A.)  Gagliardi served as Union County Superintendent of Schools from 1983 to 1991;

Superintendent of Union County Vocational-Technical Schools from 1991 to 1994; a policy

advisor to Senate President Donald DiFrancesco from 1994 to 1997; a special assistant to the

Commissioner of Education working on governance, finance, and operation of Abbott districts

from 1997 to 2000; and Commissioner of Education in the DiFrancesco administration from

2001 to 2002.  (*Id.*)  Since 2002, he has worked as an educational consultant, describing his work

as "[a]ssist[ing] on educational matters" and "[s]erv[ing] as expert witness."  (*Id.*)

Gagliardi reviewed: the complaint; the plaintiffs' and the State Defendants' answers to

interrogatories; the USDA 1984 memorandum; the USDA 2002 memorandum; "[n]umerous

articles, studies, and reports pertaining to nutrition, learning behavior, special education and

economically underprivileged children"; audit reports of the plaintiffs' schools for fiscal years

2006 through 2010; deposition testimony; and pertinent laws and regulations.  (Gagliardi Report,

appended to Mot. To Strike, Ex. 3, at 2–3.)

His report is experience-driven.  He has extensive experience in New Jersey school

funding that can assist the Court, which is able to parse the admissible from the inadmissible,

handle objections at trial, and generally make judgments about the testimony.

The highlight of the Federal Defendants' motion is the contention that the report must be

stricken because of a nearly 400-word footnote in his report.  (Mot. to Strike 27.)  Although he

initially testified that the report consists of his own words, he later admitted, with an explanation,

that the footnote consisted of the uncited work of another author.  (*Id.* (citing Gagliardi Report,

appended to Mot. to Strike, Ex. 3, at 15.)  The following exchange took place at his deposition:

> Q: Gagliardi Number 4 is entitled Rethinking Parental
> Participation in Special Education by Debra L. Morrissette and
> Patrick J. Morrissette.  Have you seen this before, Dr. Gagliardi?
>
> A: I use it.  I've seen it and I've used it.
>
> Q: Is it correct that you used — I'll ask it this way.  What I just
> read from the second paragraph in footnote number 2, isn't that

language verbatim what is in the article Rethinking Parental Participation in Special Education?

A: Absolutely.

Q: And didn't you similarly use verbatim what you say in the second paragraph of your report — I'm sorry, the third paragraph of your report that begins on page 15, note 2, "Turnbull and Turnbull, 1982, questioned the ability of parents to assume responsibility and collaborate with trained professionals to produce an IEP," and the rest?  Just to try to save time, isn't it correct that what you have in footnote 2 on page 15 came verbatim from the Morrissette from the Morrissette's article?

A: Absolutely.

Q: Why did you not give attribution to the Morrissettes for what you cite in your work under footnote 2?

A: Because the information that's there also stands on its own. I've used Turnbull and Turnbull many times in reports dealing with special education.  I thought it was sufficient to give credit to the original authors, not to her.

Q: You've got a doctorate degree in education, don't you?

A: Yes, I do.

Q: And you were once the Commissioner of Education for the entire state of New Jersey?

A: That is correct.

Q: And you are aware that cited and referenced work is to be given attribution, aren't you?

A: And I did do that.

. . . .

Q: Can you show me in your report the attribution to the Morrissettes and their article?

. . . .

54

A: I didn't think I had to.  I gave credit to the original people who
did the investigation and the research . . . .

(Gagliardi Dep. at 64–65, appended to Mot. to Strike, Ex. 4.)

The issue Federal Defendants raise is admissibility.  Gagliardi's explanation is that the
uncited language discusses material whose authorship he credited.  At best, Gagliardi's citation
style may be open to critique, but the Court does not find a lapse that would warrant striking his
testimony or his report.  The Federal Defendants' motion to strike his report is denied.

**VI.  Conclusion**

For the foregoing reasons, summary judgment is denied as to the claims under the
Rehabilitation Act, Americans with Disabilities Act, and the Administrative Procedure Act, and
is granted on the other claims. The motion to strike the Plaintiff-Schools' experts' reports is
denied.  An appropriate order will be issued.

/s/ Katharine S. Hayden
Date: March 30, 2012                          Katharine S. Hayden, U.S.D.J.

55