## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE DERON SCHOOL OF NEW JERSEY, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, et al., <br><br> Defendants. | Civ. Action No. 09-3477 (KSH) <br><br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

### I.  Introduction

Plaintiffs, the Deron School of New Jersey, Inc., ELO Incorporated, and KDDS Inc.—corporate entities that own and operate for-profit schools serving children with disabilities—have sued defendants the United States Department of Agriculture, the New Jersey Department of Agriculture, the New Jersey Department of Education, and their respective chiefs for allegedly discriminating against their students on the basis of disability and harming their businesses in the process.  The Court held a six-day bench trial, after which the parties submitted written summations.

Behind the litigation is the history of how the parties negotiated about, adjusted for, and stopped negotiating about, remedial statutes perceived to be on a collision course.  The basic facts are not really in dispute, and so this opinion will begin with plaintiffs' description of what

the case is about and why they brought it:

"The core facts of this case date back to 1984, when officials of the United States Department of Agriculture ('USDA') met with officials of the New Jersey Department of Education ('NJDOE') to formulate a plan to permit students attending the Deron Schools to receive federally funded free and reduced-price school lunch even though the entity that owned the Deron Schools, The Deron Schools of New Jersey, Inc. ('Deron'), was a for-profit entity and, therefore, statutorily prohibited from serving as a 'sponsor' under terms of the National School Lunch Act. The plan devised by those officials was an arrangement in which a public entity, the Montclair Board of Education, provided the meals and took responsibility for compliance with program requirements at the Deron Schools. From then on, the Montclair Board included Deron's two school sites in its food service and received reimbursement for meals served to income-eligible Deron students. The reimbursement was provided by USDA, through NJDOE and later the New Jersey Department of Agriculture (NJDOA), which administered the programs from 1997 on. In the mid-1990s, the arrangement was expanded to include Gramon School ('Gramon') and Glenview Academy ('Glenview'), whose owners also were for-profit entities. The arrangement continued, without issue, until 2007.

"Then, without any warning or explanation,[1] NJDOA notified the Montclair board and directors of the schools [ ] that the 'workaround' would be terminated. After unsuccessful efforts at the State level to have that decision reversed, Plaintiffs filed this action, challenging the termination of the workaround and seeking its reinstatement." (Pls.' Closing Br. 2–4.)

---

[1] The record establishes that over a period of years, beginning in 2000, there was intra-agency discussion, written and oral, as well as a formal memorandum on the issue of providing reimbursement for meals served at for-profit schools. For purposes of describing how plaintiffs' schools learned the Workaround was discontinued as to them, this statement is acceptable.

Having heard the testimony of the witnesses, reviewed the exhibits, and considered the parties' written summations, the Court, in accordance with Fed. R. Civ. P 52(a), sets forth its factual findings and legal conclusions.

## II. <u>Factual Background</u>

### A. <u>Introduction</u>

Fed. R. Civ. P 52(a) directs the Court to make findings of fact. Here, the facts are not in dispute; rather it is the implications that flow from them. The Court will therefore provide a narrative, supported by citations to the operative statutes and the trial record, which, particularly through the live testimony, provided the Court with context about the relevant events.

Plaintiffs called the following trial witnesses: Dr. David Weeks, the CEO of plaintiffs ELO Incorporated and KDDS Inc.; Kenneth Alter, the owner and director of plaintiff The Deron School of New Jersey, Inc.; Dr. Vito Gagliardi and Robert Davis, called as experts on matters relating to the New Jersey public-school system; and Barbara Martin, a former employee of defendant USDA. Defendants' fact witnesses were Mary Jane Whitney and Cynthia Long, both employees of defendant USDA; Elise Sadler-Williams, an employee of defendant NJDOE; current and former employees of defendant NJDOA, Emily Lomerson, Janet Hawk, and Katherine Attwood; and as an expert offered to rebut the opinions offered by Robert Davis, Dr. William Hamm, an economist, testified.

The parties also submitted deposition excerpts from other witnesses. [D.E. 294, 297, 299.]

### B. <u>The Parties</u>

Plaintiff The Deron School of New Jersey, Inc. is a New Jersey corporation that owns and operates two private, for-profit schools for disabled students, Deron I and Deron II. (Joint

Stipulation of Facts ("JSF") ¶¶ 1, 5.)  Kenneth Alter is the owner and director of the schools, which were founded by his parents.  (T2:71:7–9, 14–15 (Alter).)[2]  Deron serves students who have been classified as having multiple disabilities.  (T2:71:14–19 (Alter).)

Plaintiffs ELO Incorporated and KDDS Inc. are limited liability corporations in New Jersey that own and operate, respectively, The Gramon School and Glenview Academy, both of which are private, for-profit schools for disabled students.  (JSF ¶¶ 2–3, 5.)  The "Weeks family partnership," comprising Dr. David Weeks, his wife, and two children, owns the holding company that owns the schools.  Weeks and his wife are co-executive directors of the schools.  (T1:6:19–25, 119:25–120:5 (Weeks).)  Their schools have traditionally served children with emotional difficulties.  (T1:93:11–13 (Weeks).)  In this opinion, the Court will refer to the plaintiff corporate entities together as "plaintiffs," and to Deron, Gramon, and Glenview together as "plaintiffs' schools."

Plaintiffs' students have disabilities that cannot be adequately addressed by their local public school districts.  (JSF ¶ 59.)  A majority of the students come from poor, urban New Jersey municipalities.  (*See, e.g.,* J-39 – J-42 (charts identifying the residences of plaintiffs' students and whether they qualify for free or reduced-price meals).)[3]

Defendant the USDA is the federal agency responsible for overseeing the Meals Programs.  (T4:51:21-23 (Whitney).)  Defendant Thomas J. Vilsack is its Secretary.  The Court will refer to these parties as the "Federal Defendants."

---

[2] Citations to trial testimony will be denoted by the transcript volume, *e.g.*, T1 (volume 1), page number, line, and witness.
[3] References to Joint Exhibits will begin with the prefix "J," and references to exhibits admitted respectively by plaintiffs, Federal Defendants, and State Defendants will begin with the prefixes "P," "FD," and "SD."

Defendant NJDOE administered the Meals Programs in New Jersey until 1997, at which point defendant NJDOA assumed the responsibility. (JSF ¶¶ 19–20.) The heads of those agencies are named as defendants and together with the agencies will be referred to as the "State Defendants."

C. Relevant Statutory Framework

In 1946 and 1966, respectively, Congress enacted the National School Lunch Act, 42 U.S.C. § 1751 *et seq.*, and the Child Nutrition Act, 42 U.S.C. § 1771 *et seq.*, which created the National School Lunch Program and the School Breakfast Program. Generally, these programs provide for financially eligible school children to receive free or reduced-price lunch and breakfast at school. The Court will refer to the programs together as the "Meals Programs" and individually as the NSLP and SBP. The statutes were enacted in furtherance of Congress's declared policy "to safeguard the health and well-being of the Nation's children," and "[i]n recognition of the demonstrated relationship between food and good nutrition and the capacity of children to develop and learn." 42 U.S.C. §§ 1751, 1771.

State governments administer the programs to schools under their jurisdiction, and must observe various restrictions and regulations to receive reimbursement for the meals. A key restriction is that reimbursement will only be provided for meals that are "served . . . in schools." *Id.* §§ 1753(b), 1773(b). And "school" is defined in the statutes as one that is "public or nonprofit private." *Id.* §§ 1760(d)(5), 1784(3). Additionally, only students who meet income-eligibility restrictions, which are tethered to government-issued poverty guidelines, are entitled to subsidized meals. *Id.* §§ 1758(b)(1), 1773(e)(1)(A).

Less than ten years after enacting the SBP, Congress passed the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, finding that "individuals with disabilities continually encounter

various forms of discrimination in such critical areas as employment, housing, public accommodations, education," and others. 29 U.S.C. § 701(a)(5). Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a), provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Regulations governing the USDA use nearly mirror-image language to prohibit discrimination. *See* 7 C.F.R. § 15b.4(a) ("No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity receiving assistance from this Department.").

Operating in the foregoing context is another federal statute—the Individuals with Disabilities Education Act ("IDEA")—which provides that states receiving funding under IDEA must ensure that students with disabilities are provided with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). What is appropriate depends in large part on a child's special needs: it may require minimal changes to the student's normal course of education, or it may require the child to be sent to an out-of-district school that caters toward students with his or her disability, such as plaintiffs' schools. A guiding principle in providing a free and appropriate education, however, is that the child should be placed in the least restrictive environment—that is, one that alters his or her normal course of education the least. *Id.* § 1412(a)(5).

D. The Out of District Placement Choice

In New Jersey, if a child does need an out-of-district placement, a process is triggered to choose the appropriate setting. As David Weeks explained from the perspective of a school being considered for placement of a public school student with special needs:

[A] child study team that's usually a psychologist, I believe, a social worker and an educator, a learning theorist . . . trigger[s] all sorts of evaluations. . . .

. . .

The purpose of these evaluations, I believe, is twofold. One is to determine if a child is, in fact, eligible for special education services and related services. And [the] second purpose is to . . . classify the youngster and determine what sort of services are necessary. Should he be in district or [in an] out of district program and questions of that sort. They can meet with an IEP team who will help develop a plan for the youngster.

And if they have decided a youngster to go to [an] out of district school, such as ours . . . a case manager . . . will take the child and parent to one, two, perhaps even three different schools that they think might be appropriate for the youngster.

. . . And I meet with this group that come[s] out after. And we provide a tour and we discuss what the school has to offer, and we really talk with the parent and the case manager [about] whether what we have, whether our programs seem[] to be well-suited to what we understand the needs of the youngster to be. . . .

If there's a match . . . we. . . give the team a letter, saying, we will accept the youngster. Ultimately, we send the state mandated contract of services to the district where the Board of Education has to sign off on it. And once that's signed off, they arrange for transportation and the kid starts shortly thereafter.

(T1:20:17–22:7 (Weeks).)

One of plaintiffs' experts, Dr. Vito Gagliardi, was a career NJ public-schools employee and former superintendent of both the Washington Township public schools and the entire Union County school system. He testified that "[e]very child that is in need of special education is so unique that there are a combination of factors" that go into the placement decision. (T2:165:21–22 (Gagliardi).) Once an out-of-district school is recommended for the child, "the recommendation is then made to either an assistant superintendent or a director of the special education of the school district. And ultimately to the superintendent of the schools, who must

then make the recommendation to the board of education for approval." (T2:162:16–20 (Gagliardi).)

If a child is placed in one of plaintiffs' schools, that school becomes the equivalent of a contractor providing services, for a fee, to the child's public school district. (T1:45:4–5 (Weeks).) Notwithstanding, the child will remain enrolled in and closely associated with his or her public school district. Weeks testified that "[t]he student belongs to the district. He's always a resident student of the district. The district provides the IEP . . . . The district is custodian of records. The child never leaves being a student of the district." (T1:46:16–21 (Weeks).)

New Jersey regulations specify that the "educational program of a student with a disability provided through contractual agreements . . . shall be considered the educational program of the district board of education." N.J.A.C. 6A:14-7.5(a). According to Gagliardi:

> There's no question . . . that they remain public school students. The records of the youngsters, the financing of the program, all administrative fiscal and legal issues remain the responsibility of the local district board of education.

(T2:156:3–7 (Gagliardi).)

> If for some reason that child is placed out of district and somehow becomes involved in a disciplinary matter . . . . [i]f that youngster would be suspended for more than ten days, the private school cannot discipline that youngster without approval from the local board of education[.]

(T2:171:19–25 (Gagliardi).) In addition, the child study team remains heavily involved with the child's education, evaluating quarterly progress reports and engaging in other informal involvement, such as regular calls to the schools. (T1:29:1–10 (Weeks).)

E. Tuition

Under New Jersey regulations related to IDEA, each board of education must ensure that "[s]tudents with disabilities, who are placed in private schools by the district board of education,

8

are provided special education and related services at no cost to their parents." N.J.A.C. 6A:14-1.2(b)(12). As private, for-profit schools, plaintiffs charge tuition for educating their students, and are permitted to add a 2.5% surcharge. N.J.A.C. 6A:23A-18.6.

The receiving private school gets paid by the sending district. Gagliardi testified that each year, private schools serving special-needs students submit estimated tuition rates to the state, which are then made available to public school districts. (T3:78:17–22 (Gagliardi).) At the end of the year, the actual cost per student that is billed to the students' public school districts may differ from the estimate. (T3:78:23–79:1 (Gagliardi).) Any variance between the actual and tentative rates for a given year is remedied through refunding or rebilling the sending district. (T1:45:23–46:1 (Weeks).) Defendants' expert Dr. William Hamm reviewed the estimated tuition of plaintiffs and 24 other New Jersey private schools and compared it to their final tuition for each year that data was available. He found that the average difference at plaintiffs' schools was almost $1,400, and at the other schools the difference was $2,900. (T5:55:21–57:7 (Hamm).) (Hamm testified that more often than not, the final tuition was higher than the estimate. (T5:56:15–20 (Hamm)).)

If a school is an appropriate match for a student, cost should not sway the placement decision. Gagliardi testified that "I have never come across a situation where an out of district placement is recommended by a superintendent and was rejected [by a board of education] specifically because of what the cost might be. They just want to make absolutely certain, that we need to spend this money to meet this youngster's needs in . . . the least restrictive environment." (T2:170:18–24 (Gagliardi).) Weeks testified that "the rules are quite clear, that placement is not based on cost. You don't place a kid in the cheapest environment. You place a kid in the most appropriate environment." (T1:28:11–14 (Weeks).)

While cost cannot be the dispositive factor, it is not irrelevant. According to Gagliardi,

> Costs of any program is always a concern by the local board of education. They are the ones in most cases that are running for office, and they want to be absolutely certain that any costs for a particular program that is usually expensive is not only necessary, but it is also serving the best needs of a particular youngster.

(T2:170:4–9 (Gagliardi).) Plaintiffs' other expert, Robert Davis, a consultant on educational fiscal matters and former business manager for certain public school districts, gave similar testimony:

> I have asked child study team directors that I've worked with [if] all things were equal and if there were, as you say, the possibility of a youngster being placed in two or more schools and meeting the legal needs of receiving an education which is appropriate for their disability, and is a least restrictive environment, would you consider the costs when you place them there? I think the answer is not only should they, or could they consider that cost, I think as a public official they have a fiduciary responsibility on behalf of the taxpayers to provide the most cost effective placement possible consistent with the statutes.

(T3:103:23–104:9 (Davis).)

F. The Workaround

Plaintiffs' schools are not required by law to serve meals to their students, but they have been doing so for decades. (T1:69:16–23; 116:12–23 (Weeks); T2:118:23–119:2 (Alter); JSF ¶¶ 35–36.) Because they are neither public nor non-profit-private entities, however, they do not fit the definition of a "school" under the Meals Programs' enacting statutes. *See* 42 U.S.C. §§ 1760(d)(5), 1784(3). Because the definition of child under the Meals Programs statutes is any person "attending . . . [a] public or nonprofit private school," plaintiffs' children are not technically included. *Id.* §§ 1760(d)(1), 1784(6).

On September 17, 1984, two NJDOE employees—Walter Colender and Kathy Kuser—met with three employees of the USDA's Mid-Atlantic Regional Office—Robert Freiler, Barbara

Martin, and Sallie Ellner—to discuss the Deron schools receiving the benefits of the Meals Programs under the "sponsorship" of the Montclair Public School District. (JSF ¶ 41.) Soon after that meeting, USDA employees wrote an internal memorandum and "draft position paper" reflecting that an agreement had been reached, known thereafter as the "Workaround." (JSF ¶¶ 43–44.) The USDA's memorialization of the meeting, which Ellner wrote, stated in part:

> Derone[4] School and the Montclair S.D. have reached an agreement wherein, in order to receive reimbursement under the NSLP for children attending the Derone School, the Montclair District will completely take over the entire food service from the Derone School; this will include the purchasing of food and the placement of District personnel in the Derone School kitchen and cafeteria. Free and reduced price applications will be disseminated and evaluated by the Derone School, but the Montclair District will check the determinations. Montclair S.D. will claim all children who participate, including those from other districts.

(J-2.)

According to the USDA memo, this arrangement was satisfactory and "would fulfill the requirement of Section 504, which addresses the handicapped." (*Id.*) Ellner, who is not a lawyer, wrote in the accompanying position paper that Deron would become a "site" for food service, but not a participating "sponsor" of the Meals Programs:

> FNS Instruction 113-6, Civil Rights Compliance and Enforcement in the School Nutrition Programs, denotes the requirement necessary to ensure Federal, State and local compliance with the provisions of Title VI of the Civil Rights Act of 1964. One of the protected categories delineated is that of the handicapped, which is addressed by Section 504 of the Rehabilitation Act of 1973. The Department's regulations on Section 504 include the following requirements:
> . . .
>
> "A recipient shall operate each assisted program or activity so that when viewed in its entirety, it is readily accessible to and usable by qualified handicapped persons." Agency guidelines state that one method of fulfilling this requirement is by means of "referrals to an accessible site."
>
> . . .

---

[4] The memorandum and position paper misspelled Deron.

11

It is clear that in order to comply with Federal regulations , the Montclair S.D. <u>cannot</u> withhold the benefits of participation in the NSLP from its handicapped students.  In this particular situation, the only way these students can participate in the Program is to receive their meals at the Derone School.  As stated above, "referrals to an accessible site" is an acceptable method of compliance with regulations.

. . .

. . . [T]he Montclair District must amend its agreement with the State Agency to include the Derone School as an additional feeding site.

(*Id.* (emphasis in the original).)  At her deposition in 2011, Ellner testified that "these kids were in Deron not by choice, but because their disabilities required them to be there" and "the people at [the] meeting concluded the Montclair workaround was required in order to meet these students' civil rights."  (Ellner Dep. 18:13–16; 22:25–23:6.)[5]

Thus, in the mid-1980s income-eligible students in the Deron schools began receiving meals through the Meals Programs.  (JSF ¶ 35.)  Alter explained the logistics: "Montclair provided lunches to us.  In the beginning, they made [ ] a fresh lunch and I remember actually having to go pick it up in Montclair and drive it over when their vans broke down.  At sometime later, they switched to providing us with freezers."  (T2:87:17–22 (Alter).)  Deron paid none of the costs out-of-pocket, and, therefore, the arrangement had no effect on tuition.  (T2:88:6–9 (Alter).)

After the Workaround began, NJDOE, and later NJDOA, regularly sent letters to private schools that encouraged for-profit schools to find a third-party sponsor to establish a Meals Programs protocol at their schools.  (P-6, P-7, P-11, P-12 (letters from  1993, 1994, 1998, and

---

[5] This testimony establishes that the Workaround came about because certain of the meeting participants deemed that it was required.  Whether that was the correct legal conclusion is, of course, the basis of this lawsuit.

1999).)  Weeks testified that he learned about Deron's arrangement and contacted an NJDOE official, who advised him to find a participating sponsor.  (T1:53:18–54:1 (Weeks).)  For two years, the Morristown public schools acted as the sponsor for Gramon and Glenview, after which the schools entered into an arrangement with Montclair that was nearly identical in operation to Deron's.  (T1:54:2–57:8 (Weeks).)

G.  The 2002 Memorandum

In 2000, the USDA was contacted about an issue concerning the Meals Programs that had come up at the non-profit Katherine Thomas School in Rockville, Maryland.  Several children from the Washington, D.C. public schools had been placed at Katherine Thomas, which did not participate in the Meals Programs.  Concerned D.C. public school officials inquired about how they could arrange for those children to obtain meals.  Barbara Martin of the USDA, testified that she and others at the USDA's headquarters discussed whether the children were eligible for the Meals Programs.  (T3:196:18–197:25 (Martin); P-17.)  Although the Katherine Thomas School inquiry triggered agency discussions, Martin testified that there were other related "situations which the headquarters office was looking at."  (T3:196:20–21 (Martin).)

An official response from the USDA was over a year in the making.  In May 2001, Martin wrote an email to a representative from the D.C. public schools and others indicating that the USDA had reached a tentative conclusion:

> We discussed this issue in general terms at our Program Directors' meeting in Denver last week.  It appears we are going to say that schools are the entities eligible to participate in the NSLP and if the school that the child is enrolled in does not have the program -- there is no responsibility (through the NSLP) to feed the child.

(P-21; T3:206:3–13 (Martin).)

On November 1, 2002, the USDA disseminated its position in a formal memorandum to its regional directors. (J-6.) That memo provided that meals served in schools that were not permitted to participate in the Meals Programs were not reimbursable. It left no ambiguity as to the status of for-profit schools: "Meals may not be claimed for reimbursement by the placement school, the home district, or another participating school (even if the home district or another participating school provides the meal), if the meal is served in[] Schools that are not eligible to participate." (*Id.*) The memorandum also made clear that no exceptions would be made for schools that serve disabled children. In a question-and-answer format, the memo provided:

**Are there special considerations for pupil placement for students with disabilities?**

As previously mentioned, the key to whether the meals served to these children may be claimed for reimbursement depends on whether the school at which the meal is served participates in the NSLP/SBP.

(*Id.*) On November 26, 2002, the USDA Mid-Atlantic Regional Office—the office that covers New Jersey—sent the memo to state child nutrition directors in the region. (JSF ¶ 26; J-9.)

H. The 2007 Notification

And then—nothing happened. For more than four years after the USDA issued the memo, plaintiffs continued feeding their students through the Workaround. (JSF ¶¶ 35–36.) That changed in 2007. According to the testimony of Janet Hawk, a former NJDOA employee, New Jersey public schools sent letters each year to parents to inform them about the availability of the Meals Programs. Around 2007, the NJDOA transitioned to a web-based system for schools to complete the paperwork, and the new system was programmed such that Montclair personnel could not alter the letterhead for the mailings going to the parents of plaintiffs' students. Montclair contacted the NJDOA about getting alternate letterheads, which alerted the

NJDOA to the fact that Montclair was being reimbursed for meals served in for–profit schools. NJDOA contacted the USDA and was told that the arrangement was impermissible. (T6:40:3–43:11 (Hawk).)

In July 2007, Weeks and Alter were notified that their schools would no longer get federally subsidized meals. Weeks emailed an official of the NJDOE, James Verner, telling him: "I am sure you would agree that our students should not be discriminated against solely because of the organizational structure of the school to which they are sent (and over which neither they nor their families nor their sending districts have any control)." (P-62.) Alter called Verner and sent a letter to Katherine Attwood, then the Assistant Commissioner of the NJDOE Division of Finance, which said in part, "Not allowing us to continue in this program after 30 years is purely discriminatory and hurts the children who are some of New Jersey's most vulnerable." (J-14.) Attwood responded,

> [A]ccording to the [federal regulations] and the enclosed memorandum from the United States Department of Agriculture, profit schools/institutions are not eligible to participate. . . . [U]nfortunately this decision was . . . based on federal law over which the department has no jurisdiction. . . . [B]ut we are committed to trying to enable schools like Deron to continue to be in the program.

(P-75.) Less than a month later, on August 10, 2007, Emma Davis-Kovacs, Director of the NJDOA's Division of Food and Nutrition, sent a letter to Montclair's School Business Administrator to inform her that after December 31, meals served at the schools would not be reimbursed through the Meals Programs. (J-15.) The Workaround was discontinued as of January 1, 2008.

I.   Aftermath

Plaintiffs' students who are income-eligible continue to receive subsidized meals of the same nutritional quality as they did during the years of the Workaround. (T1:50:21–51:8,

116:20–117:9; T2:29:8–32:11 (Weeks); T2:91:20–23 (Alter).)  Alter continues to tell students' parents that his schools participate.  (T2:117:22–118:1 (Alter).)  Weeks has no reason to believe his children can tell the difference.  (T2:32:13–14 (Weeks).)

What has changed is the underlying process.  Now, plaintiffs include the cost of the meals they serve financially eligible students in the tuition they charge the sending districts, a practice permitted under New Jersey regulations, which also permit for-profit schools to add a 2.5% surcharge on all allowable expenses.  N.J.A.C.  6A:23A-18.6; (T1:84:10–12, T2:31:21–34:18 (Weeks); T2:118:3–12 (Alter).)

Since the Workaround ended, plaintiffs' schools' annual tuition per student has increased by $11,584.  (T3:87:6–7 (Davis).)  Of that amount, $390 is attributable to the inclusion of food costs.  (T3:87:7–9 (Davis).)  Over all, food costs account for about three percent of the total increase since 2007, and amount to less than one percent of the total tuition charged by plaintiffs' schools.  (T3:87:10, 111:18–20, 113:8–15 (Davis).)

In that same time period, enrollment at the schools has declined.  The following Average Daily Enrollment statistics, the figure used by auditors to calculate the actual cost per student, are contained plaintiffs' financial audits:

|  | Fiscal Year Ending June 2007 | Fiscal Year Ending June 2012 |
| --- | --- | --- |
| Deron I | 133.2333 | 100.2857 |
| Deron II | 141.2262 | 120.2929 |
| Glenview | 75.1952 | 40.9095 |
| Gramon | 63.7762 | 29.9238 |

(J-16 – J-18, J-46 – J-48.)  The drop in enrollment has hurt plaintiffs financially, and they have tried a few remedial measures, including lay-offs, freezing salaries and pension contributions,

adding autism programs, and advertising.  (T1:92:25–94:2 (Weeks); T2:92:22–93:5 (Alter).) Weeks testified that if enrollment continues to drop, the viability of his schools could be threatened.  (T1:94:14–95:11, T2:68:4–17 (Weeks).)

### III.  Procedural History

In 2009, the schools filed a thirteen-count complaint, bringing some claims on behalf of themselves and some on behalf of their students.  [D.E. 1.]  They alleged that defendants' decision to end the Workaround violated the Rehabilitation Act, IDEA, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I of the New Jersey Constitution, the Administrative Procedures Act, the Takings Clause of the Fifth Amendment, the ADA, the New Jersey constitutional guarantee to a "thorough and efficient" free education for all children; they also brought a claim for equitable estoppel and requested the Court to issue a writ of mandamus.  The complaint survived defendants' motion to dismiss. [D.E. 41.]

In August 2011, plaintiffs notified the Court of their intent to abandon these claims: (1) equitable estoppel as to Federal Defendants only; (2) IDEA as to Federal Defendants only; (3) APA as to State Defendants only; (4) Takings Clause as to State Defendants only; (5) ADA as to Federal Defendants only; (6) writ of mandamus as to State Defendants only; and (7) the right to a thorough and efficient education under the New Jersey Constitution as to all defendants.  [D.E. 177.]  In that same letter, plaintiffs informed the Court that New Beginnings, one of the then-named plaintiff schools, which is owned by Weeks, was dropping its claims because it lacked a sufficient injury to assert that it had standing to sue.  After discovery closed, the Court granted summary judgment to the defendants as to plaintiffs' claims under the Equal Protection Clauses of the federal and state constitutions, IDEA, the Takings Clause, equitable estoppel; denied their

request for a writ of mandamus; and preserved the claims under the Rehabilitation Act, ADA, and APA.  [D.E. 194 ("Summary Judgment Op.").]  The Court further held that "[t]he APA claims are analytically distinct from the other claims . . . .  Consequently, logic and efficiency weigh in favor of denying, without prejudice, the Federal Defendants' motion for summary judgment on the APA until after the bench trial is decided."  (Summary Judgment Op. 31.)

A six-day bench trial was held on plaintiffs' Rehabilitation Act and ADA claims, during which defendants' challenge to plaintiffs' standing to bring the claims was fully aired.  After testimony closed, the Court directed the parties to submit written closing arguments.  [D.E. 302–04.]

## IV.  Analysis

### A.  Introduction

In their closing statement, plaintiffs argue that they demonstrated that their students have been discriminated against on the basis of their disabilities.  They reason that the evidence showed that the students are required to attend their schools precisely because of their disabilities, and a consequence of that placement is that they are not receiving the same federal benefits as their non-disabled peers.  The fact that they are receiving subsidized meals through tuition paid by their local school districts does not lessen the injury, plaintiffs assert, because "[t]he law does not permit the government to deny a benefit on the ground that a third party will step into the breach.  Nor does the law require a person to forgo a benefit, or to suffer discrimination in its administration, simply because he or she is able to do without it."  (Pls.' Closing Br. 58.)

Plaintiffs argue they demonstrated that they too have been injured because they now have to include food costs in tuition, causing it to rise; the increased tuition has made them less

attractive to sending districts, causing a decrease in enrollment; and the decreased enrollment has injured their fiscs[6] and forced them to take protective financial measures. (Pls.' Closing Br. 48.) Plaintiffs conclude by asking the Court "to reinstate the workaround or provide another equally effective accommodation." (*Id.* 60.)

Defendants challenge plaintiffs in particular on the question of standing. They argue that plaintiffs lack standing to sue independently because the evidence shows that the Workaround did not cause the schools' declining enrollment and its collateral consequences. (Fed. Defs.' Closing Br. 23–36.) As to third-party standing, defendants contend that the students have not suffered any injury: they are receiving the same quality, free and reduced-price meals as they were getting under the Workaround. (*Id.* 37.) Substantively, defendants argue that plaintiffs did not prove each element of their claims because the students' ineligibility is not based on their disabilities, but on the for-profit structure of the schools they attend. And to permit them to receive federally subsidized meals would be to directly contravene the Meals Programs statutes and would not be a reasonable accommodation, which is the paramount consideration of a Rehabilitation Act claim. (*Id.* 6–12.)

After hearing the trial testimony, reviewing the exhibits introduced into evidence, and reading the closing arguments, several things are clear to the Court. Plaintiffs mounted an up-hill legal challenge, both for business reasons and out of genuine concern for their students. Ultimately they distilled the varied procedural and substantive arguments that have come up

---

[6] This opinion would not be complete without acknowledging the short and unhappy life of the term "fiscal death spiral." This hyperbolic description of the financial impact on plaintiffs summoned up the defendants' scorn in writing and on the record. That plaintiffs failed to support it and quickly sought a dignified retreat from the term, represents one of the vagaries of litigation that every lawyer dreads.

since the complaint was filed, into the position that the Workaround is an accommodation that the law requires and the Court must therefore reinstate.

In this, plaintiffs are repeating what Sallie Ellner espoused in her memo of 1984. But the Workaround came about through mutual brainstorming by Montclair school officials and USDA personnel, who hit upon a device that served everyone's interests—not through litigation. Once well tested jurisprudence is introduced into the situation, it is problematical that this is at its heart an accommodation case, and even assuming it can be fairly characterized as such, there is a predicate issue. Plaintiffs' proofs are tenuous at best on whether increased tuition has had any meaningful effect on their enrollment. And plaintiffs' students are still obtaining nutritional, subsidized meals. This weighs heavily against plaintiffs when the Court considers, as it must at this juncture and with the full benefit of a trial, the question of plaintiffs' standing.

The Court recognizes that this threshold issue has consistently been defendants' rallying cry. The somewhat intricate nature of how school districts have responded to their mission of providing an appropriate education for disabled students warranted, in the Court's estimation, a fuller exposition of how things work (for want of a better term) than motion practice could offer. Plaintiffs responded with two good expert witnesses who explained the connection between public schools and private placement, but neither was able to tether the discontinuation of the Workaround to declining enrollment. Indeed, because their experts were knowledgeable, plaintiffs' proofs supported defendants' arguments that far more than a 3% increase in tuition is involved in how private schools offering specialized educational services will fare in the future. The somewhat murky testimony on how plaintiffs' schools' business practices have been affected also failed to add up to a persuasive showing of harm. The testimony of those who have the most knowledge about the effect of the Workaround and post-Workaround on the students—

Weeks and Alter—conclusively established that the same meals are being provided and there is no plan to discontinue them, and that the cost is ultimately borne by the school districts, not plaintiffs.

B. Standing

The law of standing is familiar: "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. – , 133 S. Ct. 1138, 1147 (2013) (citation omitted). When a plaintiff sues to vindicate the rights of third parties not before the Court, there are additional preconditions to suit: "1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a 'close relationship'; and 3) the third party must face some obstacles that prevent it from pursuing its own claims." *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288–89 (3d Cir. 2002).

a. Plaintiffs' Independent Standing

At the outset, the Court finds that throughout this litigation plaintiffs have attempted to demonstrate they have been injured by the cessation of the Workaround in the following way: with increased tuition caused by including food costs, they have become less attractive to sending districts relative to other private schools serving disabled students, which has resulted in a decrease in enrollment and efforts to deal with lost revenue. That this is plaintiffs' theory has been borne out by prior motion practice as well as the factual evidence and expert testimony they elicited at trial. To meet the causation prong of standing, therefore, plaintiffs had to demonstrate to the Court that "the alleged injury-in-fact is causally connected and traceable to an action of the defendants." *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000). While the "causal connection need not be as close as the proximate causation needed to succeed on the merits of a

tort claim," *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009), plaintiffs still had to make an evidence-based showing that they have suffered a decline in enrollment because of defendants' actions and not "'the independent action of some third party not before the court,'" *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976). Keeping in mind that standing is being tested in a trial, not on motion, the Court is guided by the observation of the Third Circuit that while "[a] plaintiff need not prove causation with absolute scientific rigor to defeat a motion for summary judgment," the court added in a footnote that "[o]f course, plaintiffs must, if challenged, prove their allegations at trial." *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 & n.7 (3d Cir. 1990). At a minimum, Article III requires a plaintiff "to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. 490, 505 (1975).

Expert testimony established, without dispute, that annual tuition has increased by $11,584 since the end of the Workaround. (T3:87:6–7 (Davis).) Albeit food costs have contributed less than $400 to that increase (T3:87:7–9 (Davis)), basic economic principles and common sense suggest that when the price of something goes up, demand goes down. But notwithstanding the superficial appeal of the argument, Weeks and Alter were unable to establish that they actually have lost any students as a result of including food costs in their tuition. Weeks and counsel for the Federal Defendants had the following exchange:

> Q. Okay. Do you know if [ ] any of the declining enrollments that you have experienced can be attributed to having to feed the kids? Having to incur the food costs?
>
> A. I don't actually know that. But I believe firmly as prices go up referrals go down.

(T1:92:18–92:24 (Weeks).)

> Q. . . . No sending district has informed you that it refused to send a student to one of your schools because tuition rose since the end of the workaround, correct?

> A. That is correct.

(T2:26:21–25 (Weeks).)  When Alter was asked whether he "lost any students as a result of the end of the workaround," he responded, "I don't know specifically."  (T2:99:15–17 (Alter).)  At his deposition, Ron Alter, the founder of the Deron schools was asked, "Do you know whether any sending district has not sent a student to Deron because of tuition increases?"  He answered, "I do not know specifically that it was because our tuition has increased."  (R. Alter Dep. 72:24–73:2.)

Plaintiffs' experts did not bolster their claims either.  Gagliardi testified that "cost is always a consideration for [the] local board of education."  (T2:179:21–23 (Gagliardi).)  He emphasized that sending districts are sensitive to costs and want to ensure that an out-of-district placement is justified before agreeing to the contract.  (T2:163:6–17, 165:3–13, 182:17–25 (Gagliardi).)  But he could not testify to what extent cost in general or cost directly attributable to meals has affected enrollment at plaintiffs' schools.  (T3:35:12–16, 36:7–16 (Gagliardi).)

Robert Davis testified that the increase in tuition attributable to food costs is a "contributing," but not sole, factor to plaintiffs' declining enrollment.  (T3:109:11–21; 120:11–13; 122:7–11; 133:25–134:3; 135:8–9 (Davis).)  He said that increased food costs are especially problematical at plaintiffs' schools because, unlike non-profits, increased tuition raises the surcharge that plaintiffs bill to sending districts.  (T3:109:11–15 (Davis).)  Davis said that he would not be surprised if a district business administrator thought a $400 made a difference when considering a private placement; he added, "I would make a decision based on $200."

(T3:100:1–9 (Davis).) However, he testified that he did not know "how much of a decrease in enrollment . . . was attributable to the 3 percent increase in food service costs." (T3:119:24–120:3 (Davis).) Moreover, he said several times that factors other than increased costs could have caused the decline in enrollment at plaintiffs' schools, and he did not run a test to exclude them as the sole causes. (T3:122:22–123:2; 125:11–13, 135:20–22 (Davis).) He also testified that his conclusions were based on his experience in the public education field and conversations with school officials regarding whether they "look at costs as a factor when all other things are equal and there are multiple schools which can provide an appropriate education for youngsters' handicap[s] . . . . Just did [they] consider costs." (T3:120:25–121:10 (Davis).) But when he was asked, "[D]id you speak with any superintendent in any district that sends students to plaintiffs' schools, and did you ever ask them whether or not they are going to or not going to send a student to one of the schools because of costs," he said he had not. (T3:150:18–25 (Davis).) And the conversations he referenced were not limited to districts considering sending students to plaintiffs' schools—in fact, it is unclear from his testimony whom he spoke with.

Thus plaintiffs' evidence from both its fact witnesses and its experts, was at best inconclusive about the effect of the Workaround's discontinuation on enrollment.

In contrast, defendants' expert Hamm testified that sending districts find out about the tentative tuition rate at the time a placement decision is made, and it often varies substantially from the final tuition—on average by $1,400 at plaintiffs' schools and by $2,900 at certain other private schools. (T5:55:19–57:7 (Hamm).) So sending districts do not know the final cost of the service they will be paying for. Moreover, it is unlikely that differences less than $400 in tentative tuition rates would affect a placement decision; anticipated savings could easily be lost at the end of the year if the final costs vary by thousands of dollars. (T5:144:17–145:4 (Hamm).)

In addition to the uncertain price tab, in Hamm's words, special education is "an essential product," not a discretionary expense, because sending districts are *required* to provide disabled students with a free appropriate public education in the least restrictive environment. (T5:61:18–22 (Hamm).) Thus, if a particular school is an appropriate setting, changes in price cannot affect the decision to place the child there. This point was echoed by plaintiffs' witnesses. For example, Gagliardi said, "I have never come across a situation where an out of district placement is recommended by a superintendent and was rejected specifically because of what the cost might be." (T2:170:18–21 (Gagliardi).) And plaintiffs elicited testimony from Weeks and Gagliardi that established how fact-sensitive the placement process is and how an appropriate education is one that is uniquely tailored for each individual child. Thus, in closing, plaintiffs paraphrase Gagliardi's testimony: "other school options, including nonprofit options, may exist, but [they] would not necessarily be appropriate." (Pls.' Closing Br. 28–29.) If that is the case, and one of plaintiffs' schools is deemed to be the appropriate setting for a student, then tuition does not affect the sending district's placement decision. "[T]he rules are quite clear, that placement is not based on cost. . . . You place a kid in the most appropriate environment." (T1:28:11–18 (Weeks).) Plaintiffs do not argue that the rules are being broken, and the hint[7] that they might be, can't substitute for evidence.

---

[7] When questioned about his belief as to why enrollment at his schools was declining, Weeks provided an answer that indicated he believes that some school districts have made the costs of placement dispositive: "[W]e have heard repeatedly that the Superintendent of Schools has been leaning heavily on the Department of Ed about the costs of private schools. And from that I would extrapolate that there's implicit direction to Special Ed Child Study Teams to place youngsters in less expensive schools." (T1:92:4–9 (Weeks).) "Extrapolated," and "implicit direction" is insufficient evidence on this point, which plaintiffs do not press in their arguments.

Hamm compared plaintiffs' tuition with 24 other private schools that are in the "general area of the plaintiffs' schools that have similar tuition"[8] for the five years since the Workaround ended. He then compared the differences to the increase in plaintiffs' tuition attributable to food costs for each of those years. Using those data sets, he came up with 444 observations and was able to determine for each whether food costs caused plaintiffs' schools to become a more expensive placement. (T5:65:24–66:20 (Hamm).) His conclusion was that "in 440 out of 444 cases, the plaintiff school's [tentative] tuition either exceeded the competitors by more than the increase in food service costs or was still below the competitors and thus, very unlikely to have made a difference in placement decisions." (T5:67:8–14 (Hamm).) In over 99% of the cases, then, food costs did not mathematically affect plaintiffs' competitive position.

Plaintiffs' own witnesses acknowledged that enrollment has declined at most New Jersey private schools that serve disabled children. (T3:109:5–7 (Davis); T2:26:13–20 (Weeks).) Since 2007, the total number of children in New Jersey that need special-needs services has dropped, as has the number of disabled children that require out-of-district placements. (T5:78:17–79:8,

---

[8] At trial, the parties disputed how to characterize these other schools. Relying on the way plaintiffs had prefaced the answer to the interrogatory in which they provided the names of these schools, defendants attempted to pin plaintiffs into conceding that they were "competitor" schools where their students could attend and receive an appropriate education. (T4:147:3–19 (Sandberg).) Plaintiffs, on the other hand, represented at trial that, although they called the schools "competitors" in the interrogatory answer, the schools were in actuality those in the "general area of the plaintiffs' schools that have similar tuition." (T4:149:18–24 (Liss).) With that said, this semantic sparring has no effect on Hamm's analysis. Plaintiffs were unwilling to say that they had any competitors (which severely hampers their standing argument) and, without objection, Hamm—a rebuttal expert—testified that Davis used a subset of these same schools when preparing his expert report. (T5:57:8–16 (Hamm).)

The real implication of whether or not plaintiffs have competitors went toward a substantive issue under the Rehabilitation Act: whether plaintiffs' students lack access to the Meals Programs benefits solely based on their disability, or whether they have access to the benefits at non-profit schools where they could receive an appropriate education. For reasons explained below, the "competitor" issue is not outcome determinative.

80:18–22 (Hamm).)   Weeks and Alter testified about NJDOE's intensified effort to educate disabled children in their local school districts.   (T2:45:7–47:23 (Weeks); T2:139:13–140:2 (Alter).)  For example, in recent years, NJDOE has been providing training so that public school can provide appropriate services to disabled children in district.   (T2:45:23–46:1 (Weeks).)  Interestingly, plaintiffs are doing relatively better than many other schools in terms of enrollment: Hamm testified that plaintiffs' enrollment is down 21% since 2006, whereas all separate setting schools are down 31% during that same time period.  (T5:91:15–22 (Hamm).)

Plaintiffs had to "establish standing in the same manner as would be required to prevail on the ultimate merits of their case."  *ACLU-NJ v. Twp. of Wall*, 246 F.3d at 261.  "Thus, at the trial stage, particularly where—as in this case—the defendant contests the bases for standing, the plaintiff bears the burden of establishing that the elements of standing are satisfied by a preponderance of 'the evidence adduced at trial.'"  *Am. Booksellers Found. For Free Expression v. Dean*, 202 F. Supp. 2d 300, 311 (D. Vt. 2002), *aff'd in part, modified in part sub nom.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) (footnote and citation omitted).  Plaintiffs, therefore, had to demonstrate that the termination of the Workaround caused at least some decrease in enrollment and the collateral effects about which they complain.  They offered no direct evidence in support.  Based on plaintiffs' reliance, when all is said and done, on general theories of supply and demand; the absence of specific evidence on cause and effect; and their failure to refute the defendants' expert (beyond attacking his credentials), the Court is constrained to find that plaintiffs' proofs on causation fall short of the quantum needed to establish individual standing.

b. Third-Party Standing

In order to sue on behalf of person not before a court, the named plaintiff must also be injured by the defendants' conduct. *Pa. Psychiatric Soc.*, 280 F.3d at 288; *Amato v. Wilentz*, 952 F.2d 742, 749 (3d Cir. 1991). Because, as discussed above, plaintiffs have not been injured by the Workaround's cessation, they lack third-party standing to sue on behalf of their students. The Court finds that they lack third-party standing for another reason as well.

Throughout, defendants have challenged plaintiffs' third-party standing on the ground that plaintiffs' students have not been injured. Establishing an injury for Article III purposes requires "'a factual showing of perceptible harm.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (quoting *Lujan*, 504 U.S. at 566). If the injury has not actualized, it must at minimum be "imminent." *See Clapper v. Amnesty Int'l*, 133 S. Ct. at 1147.

Plaintiffs have asserted that their students' injury is the fact that they no longer are receiving meals through the Meals Programs. That the state has stepped into the void left by the USDA is not a remedy, plaintiffs say, because the students are being treated differently than their non-disabled peers. And plaintiffs contend that differential, in it and of itself, is a sufficient injury. (Pls.' Closing Br. 57–59.)

The Court finds otherwise. Plaintiffs' theory is that this case is about accommodating their disabled students so they receive the same Meals Programs benefits as their non-disabled peers. They have characterized their lawsuit as "a reasonable accommodation case," and urge the Court to restore the Workaround or some other effective means of getting the benefits of the Meals Programs to their eligible students. (T4:39:25–40:6 (Van Deventer).) At trial, the evidence showed that an effective means <u>is</u> in place—that, in fact, an accommodation <u>has</u> been

arrived at. For example, there was an exchange during cross-examination of Weeks by counsel for the State Defendants:

> Q. And [the meals] are still meeting the same nutritional guidelines established by the USDA as they did before the workaround terminated in 2007, yes?
>
> THE COURT: So the difference I have now is you didn't pay the vendor, the vendor worked for free, [ ] as it were, and now you do pay the vendor; everything else is as going on as before?
>
> THE WITNESS: That's correct.
>
> THE COURT: All right.
>
> Q. As far as students are concerned, there's no difference?
>
> A. Correct. Or at least I hope so.

(T2:32:4–14 (Weeks).) Similarly, Alter has not informed his students' parents that Deron is no longer participating in the Meals Programs; in fact, he continues to tell them that the school does participate. "The same meals and everything is the same. The children and the parents don't know any different." (T2:117:25–118:5 (Alter).) When the students and their parents "don't know any different," it is incongruent for the Court to order the relief sought based on the finding that an imperceptible change has caused a perceptible injury.

The Court previously expressed concern that plaintiffs' students are relying on the "kindness of strangers" for their meals, in its opinion preserving the Rehabilitation Act and ADA claims on summary judgment. (Summary Judgment Op. 20 (quoting MTD Hrg. Tr. 55:19–56:20).) The testimony at trial indicated otherwise. The state is not bending the rules or going out of its way to subsidize the students' meals: the meals are "allowable costs," which, under state regulations, can be included in tuition billed to sending districts. *See* 6A:23A-18.5(a)(20) (identifying what food costs are not allowed to be included in tuition); (T2:32:23–34:7 (Weeks);

T2:116:4–118:12 (Alter).)  Thus, as long as plaintiffs comply with regulatory requirements concerning nutritional quality and the collection of money from students who are not eligible for free lunch, their eligible students will continue to receive subsidized meals.

With the meals an allowable cost to be passed on as part of tuition, whether plaintiffs' students continue to receive them depends on plaintiffs' discretion.  Alter and Weeks did not testify that they intend to stop serving meals. To do so, they said, would negatively affect their students and would be bad for business.  Weeks said, "I want as much as possible to avoid it, because I really do believe that our schools would go desperately downhill if we eliminate it." (T2:68:7–9 (Weeks).)  Alter said he feeds the children out of a moral obligation: "it's the right thing to do"; and that Deron's "students are just so economically disadvantaged and so poor it would be immoral not to serve meals."  (T2:91:24–25, 118:17–19 (Alter).)  There is no evidence, therefore, that the schools plan to stop serving meals and put their students at risk of an imminent injury.

Because there is no perceptible effect on the students, this case is a poor fit within the third-party standing paradigm.  To illustrate: in *Craig v. Boren*, 429 U.S. 190 (1976), a beer vendor sought declaratory and injunctive relief against Oklahoma laws that permitted the sale of beer to women 18 and older and to men 21 and older.  The vendor claimed the state laws were unconstitutional because "such a gender-based differential" denied males 18–20 years of age the equal protection of the laws.  *Id.* at 192.  While the female vendor's own equal protection rights were not threatened, the Supreme Court held she had third-party standing because the laws at issue "plainly . . . inflicted 'injury in fact' upon" her: she either complied with them and lost the market share of males between 18 and 20, or broke them and risked punitive consequences.  *Id.* at 194.  Because the laws caused her palpable harm, the Court held that she was "entitled to

assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail"—namely the ability of "males 18-20 years of age to purchase 3.2% beer despite their classification by an overt gender-based criterion." *Id.* at 195, 196.

Unlike the laws at issue in *Craig*, which undisputedly caused the vendor harm, here, there simply is no proof that the termination of the Workaround is the cause of plaintiffs' drop in enrollment. Similarly, plaintiffs have not shown that any harm has been inflicted, or imminently will be inflicted, upon their students,[9] which again is unlike *Craig*, where males between 18 and 20 were denied constitutional rights and prevented from purchasing beer. Plaintiffs' students have not been impaired from receiving what are, effectively, the benefits of the Meals Programs. By trying to fit their facts into the third-party standing framework, plaintiffs took on a difficult challenge, and they have not met it.

C. Rehabilitation Act & ADA Claims

Although not required based on the foregoing conclusion on standing, the Court will address the substantive claims.

To succeed on the merits of both the ADA and Rehabilitation Act claims, plaintiffs had to establish that their students (1) have disabilities; (2) are otherwise qualified to participate in the Meals Programs; and (3) were denied the benefits of the programs because of their disabilities. *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). The Rehabilitation Act also requires a showing that the program receives federal

---

[9] In its research, the Court was hard-pressed to find many cases where third-party standing was challenged on the grounds that the absent party's rights had not been harmed. This is unsurprising and further exposes the weaknesses in plaintiffs' theory.

assistance.  *Id.* at 189 n.20.  In its summary judgment opinion, the Court narrowed the triable

issues to the second and third elements:

> Here, there is no dispute as to the first and fourth elements: the students are
> handicapped within the meaning of the Act, and the program is funded by the
> USDA and administered by NJDOA.  The disputes arise over whether the
> students are 'otherwise qualified' and whether they have been excluded solely by
> reason of their handicaps.

(Summary Judgment Op. 26.)  At trial, plaintiffs bore the burden of establishing the elements of

their claims by a preponderance of the evidence.  *See K.R. ex rel. Riley v. Sch. Dist. of*

*Philadelphia*, 373 F. App'x 204, 208–09 (3d Cir. 2010).

"An otherwise qualified individual is a person who can meet all of a program's

requirements in spite of a disability, with or without reasonable accommodation."  *Millington v.*

*Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008); *see also Southeastern*

*Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979).  "'The standard for reasonableness under the

ADA does not differ from the one employed under the Rehabilitation Act.'"  *Halpern v. Wake*

*Forest Univ. Health Sciences*, 669 F.3d 454, 462 n.5 (4th Cir. 2012) (citation omitted).  A

reasonable accommodation is one that would enable plaintiffs' students to meet the basic

requirements of the Meals Programs.  *Millington*, 261 F. App'x at 366.  But an accommodation

is unreasonable if defendants can show that it would require a fundamental alteration to, or the

modification of an essential aspect of, the programs.  *Id.* at 367; *Halpern*, 669 F.3d at 464.

Plaintiffs contend that their students are qualified to receive the Meals Programs' benefits with

reasonable accommodation—the Workaround.  (Pls.' Closing Br. 25–27.)

Federal Defendants argue that the Workaround is simply not a reasonable

accommodation.  They contend that the participants at the 1984 meeting made a mistake and

created the Workaround without proper authority.  (Fed. Defs.' Closing Br. 11–12; T4:55:23–

56:24 (Whitney).)  They assert that "the law prohibits for-profit private schools from participating in the Workaround" and that "[t]he exclusion of for-profit schools from the School Meals Programs is an essential aspect of those programs."  (Fed. Defs.' Closing Br. 12, 20.)  To allow reimbursement for meals served at for-profit institutions would open the Meal Programs up to entities that were never meant to participate.  (*Id.* at 20.)

> The Statutes permit the USDA to subsidize only meals "served in" public and non-profit private schools, §§ 1753, 1757, to students "attending" such eligible schools, § 1760(d)(5).  Notwithstanding the students' enrollment in and connections to their sending districts, the meals for which Plaintiffs seek reimbursement are "served in" *in*eligible institutions – for-profit private schools – to students who attend *in*eligible for-profit private schools.

(*Id.* at 9 (emphases in the original).)

Plaintiffs make the argument that reinstating the Workaround would not fundamentally alter or affect an essential aspect of the Meals Programs.  They have a point, because the Workaround's reasonableness, if reasonable is the equivalent of "workable," is obvious from  the history of this case—it was in place for over 20 years and no one complained.  In fact, the Workaround was workable enough that it was encouraged through the annual letters sent by State Defendants suggesting that other for-profit schools find participating "sponsors" to provide their students with the federally subsidized meals.  (*See* P-6, P-7, P-11, P-12 (annual letters).)  None of defendants' witnesses could testify that the Workaround had any negative effects on the practical administration of the Meals Programs.  (T5:164:20–23  (Sadler-Williams (NJDOE)); T4:126:13–127:7 (Long (USDA)); T6:53:2–10  (Hawk (NJDOA)).)  And it was only through circumstances completely unrelated to the Workaround, long after its implementation, that the USDA issued the 2002 memorandum, and even then the Workaround continued for more than four years.

But plaintiffs' argument fails legally for two reasons. First, the essential purpose of the programs, as stated by Congress, is to provide adequate nutrition to school children "*by assisting the States, through grants-in-aid and other means*." 42 U.S.C. §§ 1751, 1771 (emphasis added). The terms and conditions of, and procedures associated with, the provision of that aid to the states is at the heart of the statutes. Congress's decision to limit reimbursement to meals served in public and non-profit schools is a clear and pivotal aspect of those conditions. Through their proposed accommodation, plaintiffs effectively seek an order directing the USDA to waive an explicit limitation for their benefit, and have offered no authority for such an imposition of their will on the federal agency. In *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001), the Supreme Court ruled that under the ADA, a professional golf association had to waive for a disabled golfer a requirement that participants walk the course of one of its tournaments. The Court held, however, that it was a peripheral rule, and "the waiver of an essential rule of competition for anyone would fundamentally alter the nature of petitioner's tournaments." *Id.* at 689. In *Halpern v. Wake Forest University Health Sciences.*, 669 F.3d 454 (4th Cir. 2012), the Fourth Circuit considered whether a university had violated the Rehabilitation Act and ADA for dismissing a student who was in violation of a professionalism requirement, which he alleged was caused by his ADHD and other disabilities. In finding that the plaintiff could not establish his claim, the Fourth Circuit said that he "could not reasonably seek to avoid or lessen the professionalism requirement." *Id.* at 464. Similarly, here, plaintiffs cannot seek to waive or avoid an explicit limitation on what schools qualify for the aid that the federal government provides to the states.

Second, to the extent plaintiffs suggest that the Rehabilitation Act's accommodation principle takes precedence over the limitations in Meals Programs statutes, that suggestion is

wrong as a matter of law.  "Section 504 may not be used to expand the delivery of benefits awarded under another statute if that statute otherwise restricts the delivery of benefits."  *Brecker v. Queens B'nai B'rith Hous. Dev. Fund Co., Inc.*, 607 F. Supp. 428, 436 (E.D.N.Y. 1985), *aff'd*, 798 F.2d 52 (2d Cir. 1986); *see also Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987).  In *Knutzen*, plaintiffs were two mentally disabled individuals who applied for public housing at the defendants' building, which had received funding and subsidies under § 202 of the Housing Act of 1959.  *Knutzen*, 815 F.2d at 1345.  Because it received that funding, the defendant was required to provide housing to the "elderly or handicapped."  *Id.* at 1347.  The law specified four groups of persons that qualified as "elderly or handicapped," and the Tenth Circuit interpreted § 202 as permitting the defendant to choose to provide housing to one of the groups, but did not require the defendant to provide housing to all of them. *Id.* at 1349. Defendants made housing available to the elderly and the mobility impaired, but categorically barred the mentally impaired.  *Id.* at 1345.  Plaintiffs, who were under 62 and mentally but not mobility impaired, contended that defendants' selection criteria violated the Rehabilitation Act. The Tenth Circuit ruled against the plaintiffs, finding that forcing defendants to consider plaintiffs for admission would require an expansion of § 202 that was unintended by Congress and in contravention of its language.  *Id.* at 1353–54.

Here too, Congress's intent to limit reimbursement to public or non-profit schools through the Meals Programs is explicit, and the Rehabilitation Act does not trump those limitations.  As the court in *Knutzen* held, a different holding would  "use a general civil rights statute, § 504, to revoke or repeal . . . a much more specific statute with an articulated program, in violation of the well-settled rule of statutory construction that a general statute will not be construed so as to repeal or revoke another more particular statute . . .  absent express language

35

by Congress stating its intent to revoke or repeal that statute." *Id.* at 1353 (citations and internal quotation marks omitted).

The Rehabilitation Act and the ADA required plaintiffs to show that their students were qualified to receive the benefits of the Meals Programs, with or without reasonable accommodation, and that they were denied the benefits because of their disabilities. *Chambers ex rel. Chambers*, 587 F.3d at 189. Plaintiffs have voluntarily chosen to be for-profit entities, and that choice triggers their exclusion from obtaining federally-reimbursed meals. While the trial testimony demonstrates how tailored the private-placement process is, how the students are effectively placed by the sending districts in plaintiffs' schools, and how connected the students remain to their sending districts, the fact is they are attending for-profit schools, and Congress has not authorized the reimbursement of meals served there. The Court thus finds that they have been denied federally subsidized meals, not on the basis of disability, but because they are not qualified to receive them.[10]

D. Administrative Procedures Act

At summary judgment, the Court declined to address plaintiffs' APA claim until the bench trial had been completed. (Summary Judgment Op. 31.) However, "a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by

---

[10] Moreover, the evidence establishes that the cost of meals served to financially eligible students is an allowable expense the private for-profit schools can charge as part of the tuition that is fully paid for by the sending district. And the sending district continues to monitor and provide a free and appropriate education for plaintiffs' students, a connection between district and student that plaintiffs' evidence established remains unbroken notwithstanding the private placement. Were plaintiffs' schools to stop providing the meals and decrease tuition accordingly, that would be a lawsuit—only plaintiffs would likely be the defendants.

the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* - U.S. -, 132 S. Ct. 2199, 2210 (2012) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Since the Court has found that plaintiffs lack Article III standing, the Court need not address the prudential "zone of interest" standing requirements or the merits of their APA claim.

## V.  Conclusion

For the foregoing reasons, the Court concludes that plaintiffs have not proven that they have standing, or that defendants' conduct ran afoul of the Rehabilitation Act or the ADA. An appropriate order entering judgment for defendants and against plaintiffs will be entered.


September 3, 2013                                    /s/ Katharine S. Hayden
                                                    Katharine S. Hayden, U.S.D.J